Karen Renee AUGUSTUS, a Minor, by Charles A. Augustus, her father, and next friend, et al., Appellants,

v.

The BOARD OF PUBLIC INSTRUCTION OF ESCAMBIA COUNTY, FLORIDA, et al., Appellees.

No. 19408.

United States Court of Appeals
Fifth Circuit.

July 24, 1962.

Charles F. Wilson, Pensacola, Fla., Constance Baker Motley, Jack Greenberg, and Derrick A. Bell, Jr., New York City, for appellants.

J. Edwin Holsberry, of Holsberry & Emmanuel, William Fisher, of Fisher & Hepner, Bert Lane, of Beggs, Lane, Daniel, Middlebrooks & Gaines, Richard H. Merritt, Pensacola, Fla., for appellees.

Before TUTTLE, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment modifying and approving what was proposed as a plan for the desegregation of the public schools operated under the supervision of The Board of Public Instruction of Escambia County, Florida. Pensacola is the County's largest city. The school population of the County totals approximately 37,000, of which about 28,521 are white and 8,557 Negro. In Pensacola the schools are divided into elementary, junior high, and senior high schools. There are two Negro schools in the County outside of Pensacola at which junior high school programs are offered, Carver located at Century and Ransom located at Cantonment. One technical high school in Pensacola has white pupils only enrolled. The Negro high schools, however, offer some technical programs. The Board has under its jurisdiction two junior colleges, one limited to white and the other to Negro students. It also operates adult education programs under a single director but with separate programs for white and for Negro adults.

Children of both races who live two miles or more from the schools to which they are assigned are eligible for transportation. Buses which pick up children of one race do not pick up those of the other race.

Negro teachers and principals are assigned to Negro schools, and white teachers and principals are assigned to white schools. Professional training courses are conducted separately for the two races. In some special committees that work on administration problems they meet together. There are thirty-six special teachers who work with retarded children, crippled children, those hard of hearing or who suffer from speech defects or sight impairment. No particular teachers are assigned for special work with intellectually gifted children. The evidence does not contain a breakdown of these special teachers as between Negroes and whites. There are three Negroes in supervisory capacities above the level of principal, one of whom supervises the Negro elementary schools, and the other two are visiting teachers working in the area of attendance and with problems that arise between schools and homes.

The curricula for the two races are the same in all the schools. The qualifications of teachers are the same, and the salaries paid Negro and white teachers who have similar qualifications are the same. General achievement tests are given in the fourth, sixth, and ninth grades, and a senior placement test in the twelfth grade. In relation to the individual grades, the white and Negro pupils measure up alike on an average.

Prior to the enactment of the Pupil Assignment Law,[1] white and Negro children were assigned to separate schools on the basis of race, in compliance with Chapter 19355, Laws of Florida, Act of 1939, which provided:

"The schools for white children and the schools for negro children shall be conducted separately. No individual, body of individuals, corporation, or association shall conduct within this state any school of any grade—public, private, or parochial —wherein white persons and Negroes are instructed or boarded in the same building or taught in the same classes or at the same time by the same teachers."

Beginning August 22, 1956, one month after the Pupil Assignment Law was approved, the Board has each year adopted a resolution "incorporating that Law" for the succeeding year, and assigning each pupil back to the school which he previously attended. As a result of this blanket assignment, all Negro pupils were reassigned to Negro schools and all white pupils to white schools. Children new to the school sytem were assigned pursuant to application made by the parent for admission of the child to a school and subject to the criteria set forth in the Pupil Assignment Law. The school system was completely segregated in fact when the complaint in the present case was filed on February 1, 1960.

The complaint was filed on behalf of twelve minor Negro pupils by their parents and next friends against the Board of Public Instruction of Escambia County, Florida, and its members and the County Superintendent of Public Instruction. The district court sustained the motion of the defendants to strike from the complaint the allegations relating to the assignment of teachers, principals and other school personnel on the basis of race [2] and the prayer for relief based on those allegations.[3]

Thereafter an answer was filed and a pre-trial conference held. Pursuant to that conference a hearing was set,

" * * * to determine the following issue of fact:

"(a) Whether or not the plaintiff children, or one of them, were, or have been or are being, denied admission to O. J. Semmes Elementary School of Escambia County due to race.

"(b) On this issue the parties agree to submit testimony of no more than three (3) witnesses to the side.

"(2) The Board of Public Instruction of Escambia County, Florida, will come prepared to advise the Court as to matters inherent in the

---

1. Florida Statutes, Section 230.232, adopted by Chapter 31380 of the session laws of Florida enacted by the 1956 Special Session, approved July 22, 1956, amended by Chapter 59–428 of the 1959 Florida Legislature, F.S.A.

2. " 'The plaintiffs, and members of their class, are injured by the policy of assigning teachers, principals and other school personnel on the basis of the race and color of the children attending a particular school and the race and color of the person to be assigned. Assignment of school personnel on the basis of race and color is also predicated on the theory that Negro teachers, Negro principals and other Negro school personnel are inferior to white teachers, white principals and other white school personnel and, therefore, may not teach white children.'

" '* * * and as a result of the policy of assigning school personnel on the basis of race * * *.' "

3. " '4. Enter a decree enjoining defendants, their agents, employees and successors from assigning teachers, principals and other school personnel to the schools of Escambia County on the basis of the race and color of the personnel to be assigned and on the basis of the race and color of the children attending the school to which the personnel is to be assigned;'
and the following portion of paragraph 5:
" '* * * the assignment of teachers, principals and other school personnel on a nonracial basis * * *.' "

development of a plan for the assignment of pupils in accordance with the Constitution of the United States and to advise the Court as to a specific date in which it can formally submit such plan to it for the consideration of the Court."

After the hearing and the arguments, the court ordered the testimony transcribed. On March 17, 1961, the court entered its order as follows:

"Based upon the depositions filed in this cause and upon the testimony presented at hearing on January 16, 1961, the Court finds that plaintiffs have established on this record that applications for admission to and transfer within the public schools of Escambia County, Florida, are acted upon by the Board of Public Instruction, on consideration of the race or color of the individual applicants in violation of the constitutional rights of said applicants as provided by the Supreme Court of the United States in Brown v. Board of Education of Topeka, 347 U.S. 483 [74 S. Ct. 686, 98 L.Ed. 873], and subsequent cases.

"Therefore, in consideration of the foregoing, the Board of Public Instruction of Escambia County, Florida, is hereby granted a period of ninety days from the date of this order to submit to this Court for its consideration 'a plan whereby the plaintiffs and members of the class represented by them are hereafter afforded a reasonable and conscious opportunity to apply for admission to', or transfer to, 'any schools for which they are eligible without regard to their race or color, and to have that choice fairly considered by enrolling authorities,' in accordance with the United States Court of Appeals, Fifth Circuit, opinion in Gibson v. Board of Public Instruction, Dade County, Florida, 272 F.2d 763."

Pursuant to that order, the Board on June 14, 1961, submitted to the court a resolution adopted that day by the Board, as follows:

"1. That upon approval by The United States District Court for the Northern District of Florida, on October 1, 1961, or at such other time as may be directed by the Court, the following letter shall be mailed by the Superintendent of Public Instruction of Escambia County, Florida, to the parents or guardians of each child who, according to the school records, will attend the public schools of Escambia County, Florida, during the 1961–1962 school term, to-wit:

"Dear Parents or Guardians:

"This letter is being sent pursuant to Order of the United States District Court for the Northern District of Florida.

"In order to facilitate the fall opening of school, we have a procedure known as Spring Registration which takes place during the 4th week of April in 1962. At that time, a Pupil Assignment Card is completed at the school for each pupil enrolled.

"While it is the function of the School Administration to recommend assignments, a parent's preference of schools will be fairly considered. You are herewith advised that you are being afforded a reasonable and conscious opportunity to apply for admission to any school for which your child is eligible without regard to race or color and to have that choice fairly considered by the Board of Public Instruction. If you wish to exercise your right of preference, you must go to the school your child is attending at the time of the Spring Registration and sign a Parent School Preference Card during the period from 23rd through 27th of April, 1962.

"The Pupil Assignment Law provides for numerous criteria in the individual assignments of pupils, such as attendance areas, transpor-

tation facilities, uniform testing, available facilities, scholastic aptitude, and numerous other factors, except race.

"Should the School Administration recommend assignment of your child to a school other than the one you have requested, you will be notified by letter prior to the fall opening of school. In that event you have the right to request, in writing, an appearance before the Board of Public Instruction to have your preference further considered. If such a request for hearing is received, you will be notified of the time and place of the hearing.

"Application for Reassignment may be made at any time when a change of residence address or other material change in circumstance arises."

The plaintiffs objected to this plan, and filed a proposed plan which provided, first, for the reassignment of all pupils "on the basis of school capacity and school census and without regard to the race or color or national origin of the children in the county," and, secondly, that "all teachers, principals, supervisors and other professional school personnel be reassigned on the basis of qualification and need and without regard to the race, color or national origin of the personnel to be assigned and without regard to the race, color, or national origin of the pupils attending the school to which such personnel is assigned."

The court held a hearing on August 17, 1961, for consideration of the plan submitted by the Board and the objections to the plan advanced by the plaintiffs. On September 8, 1961, the court adopted the plan proposed by the Board with the following modifications: (1) that the plan apply to all public schools under the jurisdiction of the Board, including the two junior colleges; (2) that the letter to parents shall be mailed on or before October 16, 1961, and shall specify, in addition, the hours of 7:30 A.M. to 6:00 P.M., for the period 23rd through 27th of April, 1962, during which parents and

guardians may exercise their right of preference; (3) that parents were to be notified on or before July 15 of denial of applications for transfer. The court retained jurisdiction for the entry of further orders.

At the time of the oral argument before this Court on May 29, 1962, the appellees requested permission to attempt to agree upon a stipulation with the appellants concerning the progress which has been made in carrying out the plan as approved by the district court, and to file any such stipulation for the consideration of this Court in reaching its decision. The Court granted permission as requested. The attorneys for the respective parties have now signed such a stipulation and the same was filed with the Clerk of this Court on June 19, 1962.

That stipulation is too lengthy to be incorporated in this opinion. We summarize its terms as follows: As a result of the letter mailed in accordance with the plan, and of other publicity, a total of 246 applications for reassignment were made during the Spring registration in the week of April 23, 1962, 63 in behalf of Negro pupils and 183 in behalf of white pupils. Six of the applications were for reassignment from formerly all-Negro schools to other formerly all-Negro schools. The other 57 of the 63 applications made in behalf of Negro pupils were for reassignment from formerly all-Negro schools to 15 separate formerly all-white schools.

Of the 246 applications for reassignment made during the week of April 23, 1962, the enrolling authorities had processed a total of 44 and made recommendations to the Board thereon, and the Board accepted all of the recommendations and acted thereon at its meeting of May 24, 1962. Sixteen of the applications for reassignment were denied, 9 of white pupils, and 7 of Negro pupils seeking reassignment to formerly all-white schools. Five of the 6 applications of Negro pupils for reassignment to formerly all-Negro schools were approved. Thirteen Negro pupils were reassigned to 8 separate formerly all-white

schools. Ten applications of white pupils for reassignment to different formerly all-white schools were approved.

The remaining terms of the stipulation had best be quoted:

"6. That the California Test of Personality was given to all of the 246 White and Negro students without regard to race, if they had not previously been given that test. This particular test had been given only to students in connection with any previous applications in behalf of students for reassignment.

"7. That the same criteria under the Pupil Assignment Law of the State of Florida were considered by the Board and the enrolling authorities as to all of the 44 students considered by the Board at its meeting on May 24, 1962, without distinction between Negro and White students. That as to the White students who had previously been tested under the county-wide testing procedure no new tests were given except the aforesaid California Test of Personality. That as to the applications of the 21 Negro students which were considered by the Board on May 24, 1962, and as to all of the total of the 63 Negro students under consideration it has just recently been discovered by the attorneys that there were other tests given in connection with those applications for reassignment by the two Visiting Teachers who were working on the records of those students in preparation for the consideration of their records by the enrolling authorities and that there is attached hereto and made part hereof, the affidavit of Mrs. Bernice J. Simpson, dated June 14, 1962, and it is stipulated that if she were present as a witness in court that she would testify as set forth in her attached affidavit.

"8. That the enrolling authorities and the Board are continuing their work on the processing and consideration of the remaining applications for reassignment."

Mrs. Simpson's affidavit attached to and made a part of the stipulation is to the effect that the 63 applications for reassignment made in behalf of Negro pupils were turned over to her and another visiting teacher, Mrs. C. M. McMillan, by Mr. R. B. Orr, the Assistant Superintendent of Public Instruction in charge of processing applications for reassignment, " * * * and affiant at that time and in the presence of Mrs. C. M. McMillan asked Mr. Orr if it would be alright (sic) to retest the Negro students for whom applications for reassignment had been made as none of them had been tested since the county-wide testing which was done during September, 1961, and since some of them had not been tested at that time affiant felt that these students had either gained or lost in their scholastic standing since their last tests, and that Mr. R. B. Orr answered affiant at that time, 'You may or may not, I am leaving that up to you' (meaning the giving of additional tests by affiant and Mrs. C. M. McMillan; affiant further says that Mrs. McMillan and affiant were not instructed or directed by Mr. Orr or anyone else to do any new testing of the sixty-three (63) students in question except to give the California Test of Personality to all those students under consideration for reassignment and who had not previously applied for reassignment and who therefore had not previously been given the California Test of Personality, which test has not been given in the past except to students for whom applications for reassignments had been made; affiant further says that affiant and Mrs. C. M. McMillan gave the California Test of Personality to all of the Negro students for whom application for reassignment had been made and who had not previously been given that test, and that they also gave the California Reading Test and the California Short Form Test of Mental Maturity on our own initiative; and affiant further says that neither affiant or Mrs. McMillan had any intention of discriminating against these students in any way in giving the

additional tests as we only desired to have current tests and I am certain that no discrimination resulted from the giving of these additional tests in the Spring of 1962."

The appellants insist that the district court erred in striking their allegations relating to the assignment of teachers, principals and other school personnel on the basis of race and the prayer for relief based on those allegations. Further, the appellants having established, as found by the district court, "that applications for admission to and transfer within the public schools of Escambia County, Florida, are acted upon by the Board of Public Instruction, on consideration of the race or color of the individual applicants in violation of the constitutional rights of said applicants," they insist that the court granted them completely inadequate relief.

The district court, at the conclusion of a full opinion, directed that "all portions of the complaint and prayer concerning teachers, administrative personnel, school system, etc." be stricken.[4] The appellants insist that the mandate to end racial discrimination in the school system carries with it a duty to end the policy of assigning teachers, principals, and administrative personnel on the basis of race. In support of that insistence, however, the appellants cite only the same cases considered and distinguished[5] by the district court in its opinion, footnote 4, supra. Assuming that the question may not be settled as a matter of law, the appellants call attention to the averment of the complaint that, "the plaintiffs, and members of their class, are injured by the policy of assign-

ing teachers, principals and other school personnel on the basis of the race and color of the children attending a particular school and the race and color of the person to be assigned." The appellants argue that the district court erred in assuming that the Negro pupils *could not* be injured by that policy.

▆▆ Whether as a question of law or one of fact, we do not think that a matter of such importance should be decided on motion to strike. As well said by the Sixth Circuit:

"Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts. * * * It is a drastic remedy to be resorted to only when required for the purposes of justice. * * * The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." Brown & Williamson Tobacco Corp. v. United States, 6 Cir., 1953, 201 F.2d 819, 822.

▆▆ A disputed question of fact cannot be decided on motion to strike. It is true, also, that when there is no showing of prejudicial harm to the moving party,[6] the courts generally are not willing to determine disputed and substantial questions of law upon a motion to strike.[7] Under such circumstances, the court may properly, and we think should, defer action on the motion and leave the sufficiency of the allegations for determination on the merits.[8] That is particularly appropriate in the present case where, as a consequence of the de-

4. Augustus v. Board of Public Instruction, N.D.Fla., 1960, 185 F.Supp. 450, 454.

5. Whether they were soundly and correctly distinguished we need not decide at this time.

6. In Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1954, 214 F.2d 891, 894, we called particular attention that the stricken allegations "might serve to prejudice the defendant or to prolong the trial."

7. Tivoli Realty v. Paramount Pictures, D. Del., 80 F.Supp. 800, 803; 2 Moore's Federal Practice, 2nd ed., Sec. 12.21 (2), pp. 2317, 2318; 1A Barron & Holtzoff, Federal Practice & Procedure, Rules ed., Sec. 367, pp. 480, 486.

8. 2 Moore's, op. cit. supra note 7, at 2319; 1A Barron & Holtzoff, op. cit. supra note 7, at 486.

segregation of the pupils, the complaint as to the policy of assigning teachers, principals and administrative personnel may become moot.[9] We hold, therefore, that, at the then stage of the proceeding, the district court erred in sustaining the defendants' motion to strike the allegations relating to the assignments of teachers, principals and other school personnel on the basis of race. In the exercise of its discretion, however, the district court may well decide to postpone the consideration and determination of that question until the desegregation of the pupils has either been accomplished or has made substantial progress.

The district court instructed the Board to submit a plan in accordance with that suggested by this Court in Gibson v. Board of Public Instruction of Dade County, Florida, 272 F.2d 763, 767:

> " * * * the Board may, if it chooses, submit for the consideration of the district court a plan whereby the plaintiffs and the members of the class represented by them are hereafter afforded a reasonable and conscious opportunity to apply for admission to any schools for which they are eligible without regard to their race or color, and to have that choice fairly considered by the enrolling authorities. In the event of the submission and approval of such a plan, the district court might properly wait a reasonable time for the necessary administrative action before finding whether further proceedings are necessary."

■ Unfortunately, until the filing of the complaint in the present case, the appellee Board, like so many others, administered the pupil assignment law in a manner to maintain complete segregation in fact. However, the actions of the Board taken in response to the instruc-

tions of the district court evidence much good faith. The Board has now gone a considerable part of the way toward compliance with desegregation of the public schools. Nonetheless, we are forced to conclude that it has not gone far enough, and that the district court should call upon it to submit an amended and more adequate plan, which will include without interruption, the steps already taken and also the additional measures now to be stated.

■■ We are reluctant to substitute our judgment for that of the district court.[10] The plan should, however, more clearly provide for the admission of new pupils entering the first grade, or coming into the County for the first time, on a nonracial basis. There cannot be full compliance with the Supreme Court's requirements to desegregate until all dual school districts based on race are eliminated. It is probably too late, without undue confusion, to require the elimination as to any grade of such dual districts in time for the 1962 fall term. The plan should, however, provide for the elimination of all dual school districts on racial lines at the earliest practicable time. If it appears too late for such elimination as to any grade in time for the 1962 fall term, then the plan should provide for such elimination as to the first two grades for the 1963 fall term, and thereafter for such elimination as to at least one successive additional grade each school year. Further amendments to the plan may be suggested by the plaintiffs and will occur to the Board, now acting in good faith, and to the district court, and operation of the plan will be supervised by the district court, all to the end that complete desegregation of the public schools may be accomplished "with all deliberate speed." The district court will, of course, retain ju-

---

9. As argued in the appellees' brief, " * * * it is as certain as tomorrow's sunrise that, under the relief granted by the lower court, beginning with the school term in September of 1962 Negro students will be taught by white teachers * * * it is not unreasonable to assume that immediately or ultimately as a result of the desegregation plan white children will be taught by Negro teachers."

10. Boson v. Rippy, 5 Cir., 1960, 285 F.2d 43, 47.

risdiction throughout the period of transition. Brown v. Board of Education, 1955, 349 U.S. 294, at 301, 75 S.Ct. 753, at 756, 99 L.Ed. 1083. The judgment is reversed and the cause remanded.

Reversed and remanded.