Delores ROSS, a Minor, by her Mother and Next Friend, Mary Alice Benjamin, et al., Appellants,

v.

Mrs. Frank DYER, as President of Board of Trustees of Houston Independent School District, et al., Appellees.

No. 19912.

United States Court of Appeals Fifth Circuit.

Dec. 28, 1962.

Rehearing Denied Jan. 25, 1963.

Weldon H. Berry, Houston, Tex., for appellants.

Joe H. Reynolds, Houston, Tex., for appellees.

Before TUTTLE, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal presents the question whether under a court-imposed stair-step desegregation plan for the Houston schools, a long standing brother-sister rule may be used where its operative effect in many situations is to compel continued attendance at a racially segregated school. In effect the brother-sister rule prescribes that as to children in the elementary grades (1 through 6), a child must attend the same school as does an older brother or sister. The District Court held that since its application was apparently nondiscriminatory, it did not violate the prior decree of desegregation. Accordingly relief against the practice was denied. We disagree and reverse.

For proper evaluation of the problem in the realistic terms which constitutional implications demand, it is helpful to summarize briefly the historical setting. The Houston Independent School District, one of the nation's largest in terms of scholastics and up to 1960 the largest segregated school system in the country, had approximately 190,000 students enrolled at the time the Judge heard this matter in January 1962. The elementary school covers kindergarten and grades 1 through 6. The secondary school is in two divisions, junior high (grades 7, 8, 9) and senior high school (grades 10, 11, 12). We are principally concerned with the elementary division. Following the traditional pattern of Southern schools, the whole system was segregated. This was not the result of spurious gerrymandering. It is open and frank. Separate zones for white children and Negroes were—and are still—maintained. Every geographical area within the system is therefore simultaneously in two zones, one for Negroes and one for whites.

In 1957 the District Court, in this same class suit by Negro parents, entered a general order. It required that the schools be desegregated with all "deliberate speed," and the School Board was ordered "to devise and adopt a plan looking to the maintenance and operation of its schools upon a racially nonsegregated basis." Nothing transpired from this order, and on April 8, 1960, the Court ordered the Board to file by June 1, 1960, "such plan as the [Board] had adopted * * * for the Court's consideration and approval." A plan was filed June 1, 1960. On August 3, 1960, the Court by formal order found that the proposed "plan does not constitute compliance with the * * * order of this Court, nor does it constitute a good faith attempt at compliance * * *." But was, rather, a " * * * subterfuge designed only to accomplish further evasion and delay."

Thereupon the Court entered its own order for desegregation commencing with the regular school term September 1960. This prescribed a stair-step plan beginning with the first grade in 1960 and successively higher grades each year thereafter "until complete desegregation is accomplished in 1972." As some question arose concerning the interpretation of this brief order, the Court entered its order of August 12, 1960, which spelled out the plan of desegregation.[1] This was peremptory in nature and provided that the School Board "will desegregate the Public schools of * * * Houston * * * pursuant to the following plan and schedule." It then spelled it out grade by grade:

"1. At the opening of the regular school term in September, 1960, each student entering the first grade * * * may, at his option, attend the formerly all-white, or the formerly all-Negro school within the geographical boundaries of which such student may reside;" [2]

"2. At the opening of the regular school term in September, 1961, the plan set out in paragraph 1. above shall be applied to all students entering the first and second grades."

and ending in subparagraph 12 which cov-

1. To facilitate discussion we refer to this as the 1960 order.

2. The kindergarten was expressly omitted. Successive grades in successive years were covered by 12 numbered separate paragraphs beginning with No. 2, reading:

The order also permitted transfers by a student and under certain conditions by the school authorities.[3] The School Board immediately appealed that order. It was immediately heard and within a brief time we affirmed. Houston Independent School Dist. et al. v. Delores Ross et al., 5 Cir., Sept. 6, 1960, 282 F.2d 95. On that appeal we had no occasion to consider, or pass upon, whether in time or grades the plan was sufficiently fast.

Meanwhile, on August 15, 1960, just three days after the 1960 order, the School Board formally, approved the Superintendent's recommendations which were, he testified below, a clarification of policies to be followed, especially in connection with the plan of desegregation. Item 2 thereof was the brother-sister rule applicable at that time to the kindergarten and grades 1 through 6.[4] Item 3 was the transfer rule.[5]

There is no indication in this record that either at the time of, or shortly after, the August 1960 order the District

Judge had any knowledge of these administrative policies or rules. The school authorities acting under them admitted 12 Negroes in September 1960 and 33 Negroes in September 1961 to four formerly all-white elementary schools. A number of Negroes otherwise entitled to attend a formerly all-white school were denied admission through application of the brother-sister rule.

On September 8, 1961, the plaintiffs filed in this original action a motion for temporary restraining order, preliminary injunction, and permanent writ of injunction. Complaint was made of discriminatory practices with particular emphasis on the brother-sister rule and the transfer rule. This was, properly so, treated by them as ancillary to the original action but despite the language of the motion and its prayer in terms of a request for temporary and permanent injunctions, the trial Court always looked on this as though it were a petition for a contempt citation.[6] Although not deci-

---

ered students "entering the first to twelfth grades, inclusive."

Paragraph 13 was a catchall providing that in "September, 1972, any grade or class not heretofore specifically referred to (if there be such), will be desegregated in similar fashion."

3. This was set forth in paragraph 14:
   "14. Nothing herein shall be construed to prevent [a] the transfer of a student at *his* request, or [b] pursuant to reasonable transfer rules promulgated by the school authorities, provided only that, in the *latter* case, the color or race of the student concerned shall not be a consideration." (Emphasis supplied; letters in brackets are also added).

4. "Item 2: If there are two or more children in a family eligible to attend any of the seven grades of elementary school, they shall all attend the same elementary school, unless a particular pupil is assigned to a special education class by the Director of Special Education."

5. "Item 3: Parents of a student requesting a transfer from the school that he has been regularly attending to another school must secure (a) written recommendation concerning the transfer from the principal of the school from which the student desires to transfer; (b) a writ-

ten recommendation concerning the transfer from the principal to which the student desires to transfer; and (c) the written approval of the Director of Attendance, Census and Transfers. Application cards with space for the reason for transfer and for the signatures of the three officials cited are available in the Census-Attendance office.

"Note A: The above rule for transfer has been applicable for some time in the secondary schools of the Houston Independent School District. It is now recommended that this same rule, which applied last year in the secondary schools, shall be applied equally in the elementary schools.

"Note B: Any student who has previously attended kindergarten or first grade in the Houston Independent School District for as much as one-half day must secure a transfer before attending any school other than the one he has previously attended.

"Note C: No student shall be denied a transfer solely on the basis of race or color."

6. For example, the Court's memorandum opinion concluded: "The motions to hold the defendants in contempt for enforcing the rules hereinabove mentioned, as constituting a violation of the prior orders of this Court, are denied." The formal or-

sive, we think this confusion was of more than a mere matter of technical, academic interest. This and comments made by the Judge in colloquy with counsel during the hearing reflect his basic approach. The approach was essentially one of determining whether the rules and their application constituted a *violation* of an outstanding order, rather than, as equally urged by the plaintiffs, a discriminatory practice which should be forbidden in the light of existing conditions without regard to whether they were, or were not, within the compass of the 1960 order.

■ We emphasize this at this point since it is now clear that even though the 1960 order prescribes a plan in specific detail, this is not the end of the matter. The District Court of necessity retains continuing jurisdiction over the cause. That means that it must make such adaptations from time to time as the existing developing situation reasonably requires to give final and effectual voice to the constitutional rights of Negro children. Our most recent Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, modified on rehearing, 308 F.2d 503 affirms this, as does Augustus v. The Board of Public Instruction of Escambia County, Florida, 5 Cir., 1962, 306 F.2d 862, 869. And since "desegregation procedures, within reasonable limits, must be flexible in order to fit local needs and new situations as they arise and present problems," we must, like a District Court, be open to a modification of our own orders. Bush v. Orleans Parish School Board (on rehearing), 308 F.2d 503.

■ The trial Court heard extensive evidence on the September 1961 motion. This certainly supported the School Board's main contention that while each of these policies was formally memorialized (see notes 4, 5, supra) right after the 1960 desegregation order, these were rules of long standing which had been followed in actual practice for many years, both in Houston and elsewhere.

To this there was added further proof that each of the rules was applied indiscriminately as to Negroes and whites. The District Court thereafter held that these school authorities were not in contempt for violation of the 1960 order (see note 6, supra), and that the application of the two rules was not discriminatory by reason of race. The appeal is expressly restricted to the brother-sister rule. No complaint is here made as to the transfer rule though, as we point out, the permissible scope of this rule does bear upon the problem presented.

■■ In the final analysis the conclusion of the District Judge as to the brother-sister rule seems to have been one of pure logic. On the basis of the evidence which showed it to be a rule of long standing applied to white and Negroes alike, the District Judge in his memorandum opinion reasoned that "the colored plaintiffs do not seek the same treatment as is afforded white students, to which they are entitled; in fact, they seek a different, and superior, treatment, by reason of their race. The law does not grant them this." But we think that logic alone is insufficient to over come the practical effect of this rule which as to some Negro families perpetuates a segregated system despite the plain purpose of the stair-step plan to ameliorate it. That it applies equally to white and Negro overlooks the fact that as to one group, compulsory attendance at certain schools has been the result of unconstitutional discrimination. The purpose of the court decree is to eradicate that unconstitutional deprivation of equal protection, no matter how felt or manifested. Ordinarily, on a declaration by a court of unconstitutional deprivation of rights, the relief granted is immediate and complete. But that is not the process encompassed in the "all deliberate speed" concept of Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. Under a stair-step plan Negroes not in the eligible

---

der referred to this as the plaintiff's prayer "for an order to show cause why the * * * School District and its

Superintendent * * * should not be held in contempt * * *."

classes continue for a time to suffer discriminatory treatment. But the law tolerates this momentarily because of two principal factors: first, there is the magnitude of the problems growing out of any overnight change; and second, the stair-step plan has as its objective the ultimate but definitive eradication of every vestigial trace of race as a basis for distinction. Thus, while the 1960 order does not in so many words provide that the system of dual zones for white and Negro students is to cease, we have now, and very recently, made plain that this is the imperative and ultimate result of a stair-step plan. "There cannot," we said, "be full compliance with the Supreme Court's requirements to desegregate until all dual school districts based on race are eliminated." Augustus v. Board of Public Instruction, supra, 306 F.2d 862 at 869. Bush v. Orleans Parish School Board, supra, 308 F.2d 491 at 502. Consequently, in the framework of the 1960 order the most remote date, so far as it now appears, for abolition of the dual zones in the elementary schools will be September 1966 (see note 2, supra). By this time the 6th grade will have finished its first year on the stair-step. The operation of the transfer rule (see note 5, supra) will likewise be limited sharply in point of time. The transfer rule is important for at least two reasons. First, it poses a problem of real administrative importance to Houston.[7] Second, a serious problem of legality exists over vesting in one or both principals the power to grant or deny the application when the occasion for the transfer is to seek the benefit of the 1960 order giving each student the right "at his option" to "attend the formerly all white * * * school within the geographical boundaries of which such student may reside * * *."[8] In the relatively short period of six years that problem will also largely evaporate when students are initially assigned to a particular school wholly without regard to race or the traditional race status of such school during segregated days.

These considerations are important in testing the application of the brother-sister rule since it is evident that between the commencement of gradual desegregation and complete obliteration of racial lines in the elementary division only six years would likely transpire (September 1960 — September 1966). That brings into sharp focus the question whether an administrative practice such as this rule could be deemed reasonable during that limited period if as to some children and on a purely accidental basis of the

---

[7] Approximately 3%—5,000 to 6,000 students—move from one zone to another each month. Obviously some administrative direction is reasonable to permit orderly control as large numbers of students wish to leave one and enter another zone.

[8] We dealt with this problem in Bush v. Orleans Parish School Board, supra, 1962, 308 F.2d 491 at 498, where, of the proposed plan and the Louisiana Pupil Placement Act (comparable in some ways to the transfer rule), we said: "The 1960 Plan gave each child an unrestricted option to attend the school nearest his home, whether it was formerly an all-white or an all-negro school. But the Board did not allow the children to exercise this option on entering the first grade. Instead, the Board assigned all children to racially segregated schools in their residential area as determined according to the Board's maps of separate Negro and white school districts for New Orleans. The Board then used the placement test only for applications for transfer. The 130 Negro children who failed their first grade tests in 1960 stayed where they were assigned; no white children were given any tests as a prerequisite to entering the first grade in white schools." 308 F.2d 491 at 498. "The School Board insists that the plan *was* applied to both white and Negro children. This is no doubt true—with respect to all Negro children applying for transfer to Negro schools and all white children applying to white schools. This is a proper constitutional use of the Act. But when, purportedly as a vehicle for desegregating, the Board applied the Act to Negro first graders only after they had already been assigned to segregated schools in a dual school system, the Board used the Act discriminatorily." 308 F.2d 491 at 499.

size and composition of their particular family, the positive "option" given by the 1960 order is taken away altogether.

The evidence on the hearing showed that this very result could readily occur to bring about the rankest sort of discrimination as between Negro children living side by side in the same neighborhood. More than mere discrimination as individuals, the operation of the rule produces a *class* discrimination of the kind condemned in Bush v. Orleans Parish School Board, supra, 308 F.2d 491 at 499. This is markedly illustrated in considering the undisputed fact of large families among Negroes. For example,[9] consider two Negro families as of September 1960, one of four children age 9, 6, 4 and 2, the other of four children age 6, 4, 2 and 1 month. In the former family, those aged 9, 6, and 4 would never be eligible to attend a primary desegregated school. During each of the years there would be at least one older brother-sister in a Negro school. The youngest (aged 2) would be eligible for the fifth grade in 1968. In contrast, all of the children in the second family would be eligible to attend all grades in a white school under the 1960 order.

We do not question that the school authorities are entrusted generally with the sole responsibility of determining whether a rule or policy of this type is wise and desirable in the operation of schools. An impressive showing was made below that there are many good reasons for this rule, such as achieving maximum value out of the family as a unit as schools encounter the many and unpredictable curricular and extracurricular problems. But it is inescapable that, no matter how fruitful the rule may be—nor how apparently evenhanded may be its application—in the transition from a segregated to a desegregated school system, it has a marked and frequently spectacular effect of preventing individual

Negro children from enjoying the constitutional rights which the 1960 order in its gradual way undertook to afford. It is no answer that, as presently adopted, the rule applies to the elementary grades alone, thus leaving the Negro students free to exercise their option beginning in 1966 when the timetable opens up the 7th grade. Besides giving to the stair-step plan an artificial and arbitrary classification—desegregation grade by grade solely for Negro children who do not have older brothers or sisters—it would, on the District Judge's approach, augment, not lessen, the transitional adjustment problems which the deliberate speed concept hopes to ameliorate. This would be to lose the very advantage of gradualism, presumably thought by the District Judge to be the virtue of a stair-step plan by which young children, free of predilections, adapt themselves to circumstances which might be disturbing to their elders.

Thus, when we view this matter not in the restrictive atmosphere of an asserted contempt—where actions are being unavoidably weighed with overtones of willful disobedience to an existing court order—but rather look upon it in terms of the intrinsic reasonableness of the condition, we are certain that the rule cannot be permitted to operate in this way. In other words, we view it now as though the matter was before us on an appeal from a court-constructed desegregation plan which expressly stated that for each of the grades, the option to attend a white school was extended successively each year solely to Negro children who did not have an older brother or sister in, or eligible to attend, a higher grade in the elementary division. No prior decision of this Court, or for that matter of any other Court of Appeals in this field, affords any basis for thinking that a stair-step plan with that built-in condition would merit judicial approval.[10]

---

9. The pleadings and the evidence revealed a number of specified individual Negro children by name who were prevented from exercising the "option" by the brother-sister rule.

10. During the argument one possible solution was discussed. The suggestion was made that instead of applying the brother-sister rule to deny admission of a younger Negro child eligible for that

Of course it can be no more valid when, unexpressed as such in the plan, application of the rule as an administrative matter produces the same result.

While we disapprove of this administrative rule in this context and on remand appropriate relief should be granted to eliminate this discrimination, nothing said or unsaid, expressed or implied, should be thought to indicate that the application of this rule by the school authorities constituted a disobedience of the District Court's 1960 order. Our approach has not been that of merely construing the terms of the order as issued in 1960. The District Judge, in denying this supplemental relief, commented in his memorandum opinion that the "evidence shows that the transition has been accomplished thus far in an orderly manner, with no destruction of the school curriculum, and with a minimum of friction and discontent." This was, he concluded, "a matter in which the City of Houston may well take pride." In this atmosphere it would be most unfortunate to substitute the recriminating charge and countercharge of contempt proceedings for the spirit of helpful cooperation so essential as all undertake in good faith to make this change over.[11]

The result [12] is that the order appealed from must be reversed, and the matter remanded for further and not inconsistent action by the District Court as it complies with the obligation to "retain jurisdiction throughout the period of transition." Brown v. Board of Education, 1955, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083.

Reversed and Remanded.

JOSEPH C. HUTCHESON, Jr., Circuit Judge (concurring in the result).

I agree with the result reached by the majority, but I prefer to reach it by a slightly different and certainly shorter road. As the majority opinion points out, we must, of course, start with the basic proposition that, while the Supreme Court has ruled that segregation as such violates the constitutional rights of Negroes, it has also held that the enjoyment of those rights is subject, to the modifying concept of gradualism which is that although segregation violates their constitutional rights, these rights need not be accorded them immediately but may be granted them over a period committed to the sound discretion of the school board and the courts.

We have thus far in Houston, on the first appeal of this case, said this period might be as long as thirteen years. However, as to certain grades of school, it was determined that the rights must be granted with some immediacy. This immediate grant of rights to certain grades

---

grade under the court's plan, the school authorities would be required to extend to the older child in the same family (then in a Negro school) the "option" to go to a white school in advance of the stair-step year. Of course any such upward option is inevitably based on a judicial determination that the rule as ordinarily enforced may not be applied literally to prevent admission of a younger child on the stair-step schedule. Of the two solutions, any such upward option may create additional problems since such older Negro children would be admitted to their respective grades perhaps long in advance of the court constructed time schedule.

11. The evidence on the hearing revealed that as initially promulgated (see note 4, supra) the brother-sister rule was applicable to kindergarten as well as to grades 1 through 6. This had the effect of re-segregating certain children, some of whom had already been admitted to white schools on the time schedule. This resulted from the fact that the stair-step plan did not include the kindergarten until the 13th year. During the time the hearing was going on, the Board on its own volition by formal resolution in effect eliminated either attendance at, or eligibility to attend, a kindergarten from the operation of the brother-sister rule.

12. Subsequent to the preparation of this opinion the Fourth Circuit in Dillard v. School Board of Charlottesville, Virginia, 1962, 308 F.2d 920, has taken similar action.

with the provision for gradually according them to others was upheld by this court as a valid order. This plan, proposed by the district judge and approved by us, on its face clearly stated that all students in certain grades were entitled to the free choice of schools. At the time of the establishment of this plan in and by the district court, no mention of any kind was made of the so-called Brother and Sister rule and particularly was no attention called to its effect on the rights accorded in the decree. When, thereafter, the board applied the Brother and Sister rule, which, though previously in effect, had not been brought to the court's attention in connection with its plan, this clearly limited the effect of the district court's grade a year plan because it carved out of the first grade those students who had brothers or sisters in the higher grades in the school and, while it is true that this rule was not adopted to produce racial discrimination and it had been long in effect on a non-discriminatory basis, it, nevertheless, had the effect on the court's ordered plan of setting aside to that extent our mandate affirming his earlier judgment.

For this reason the decree appealed from had the effect of taking away a constitutional right definitely and precisely accorded to the appellants by the judgment of the district court and of this court without any adequate showing being made that this could or should be done.

I do not by this mean to say or to suggest that the district court, having retained jurisdiction for further orders at the foot of the decree could not upon due consideration and adequate legal grounds modify the original plan. I say only that the ground put forward by the board and accepted by the court as a sound claim, the Brother and Sister rule is not, in the posture of this case, such, and that the judgment appealed from must therefore be reversed for further and not inconsistent proceedings.