313 F.2d 284
 W. S. POTTS, President of the Board of Trustees of the Fort
Worth Independent School District, et al., Appellants,
v.
Arlene FLAX, a Minor, by her Father and Next Friend,
Weirleis Flax, Sr., et al., Appellees.
 No. 19639.
 United States Court of Appeals Fifth Circuit.
 Feb. 6, 1963.
 
 Cecil A. Morgan, David B. Owen, Fort Worth, Tex., for appellants.
 L. Clifford Davis, Fort Worth, Tex., W. J. Durham, Dallas, Tex., James M. Nabrit, III, Jack Greengerg, Derrick A. Bell, Jr., New York City, for appellees.
 Before BROWN and BELL, Circuit Judges, and SIMPSON, District Judge.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 This is an appeal from an order of the District Court requiring that the Fort Worth Independent School District file within a prescribed time a plan for the desegregation of the Fort Worth Public Shools.[1] Only one question of any real moment is presented, and that is the procedural one of whether this was shown to have been class action. It is perhaps ironic that it arises in a context in which on the substantive merits there cannot be the slightest doubt that the District Court's order was a moderate and restrained response to the imperative need for judicial action.
 
 
 2
 A brief discussion of the substantive merits will facilitate disposition of the procedural problem. Unlike some of these suits, the Fort Worth Board of Trustees did not try to persuade the Court that it was now in compliance with the Supreme Court ruling in the Brown case. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. It did, of course, acknowledge both the existence of that ruling and its binding effect. But it nevertheless openly and frankly maintains, as it has for 78 years, a segregated system. Approximately 18% Of the students are Negroes. The segregated system rests on dual zones by which each geographical area is simultaneously in a white zone and a Negro zone. Its defense to the suit seeking to put an end to this systemwide noncompliance had several facets. The first was the genuine good faith belief that experience and intensive study in the light of changing legal standards proved that the interests of all students, white and Negro, of the teachers, the school system, and the community was best served by segregated schools. In that direction, the Board made a convincing showing that it was doing considerably more than mere boasting. For example, during the past ten years or so the standard achievement-test apread between Negroes and whites had steadily declined, and a disproportionate number of modern school buildings had been constructed for Negroes. Realizing that this could no longer suffice as a legal justification, the Board's real defense was the plea that no court order was now needed. The Board contended that the Court ought not to take any action until, as to any individual Negro students who might seek admission to formerly all white schools, it was actually demonstrated that the School authorities would not fulfill their duties. This suggestion of exhaustion of administrative remedies was not confined to the statutory schemes prescribed by the 1957 Texas anti-integration legislation, although a number of contentions based on Articles 2900a and 2901a[2] were asserted.
 
 
 3
 But the formal pleadings of the Board, as well as the uncontradicted evidence, most of which came from members of the Board and high-ranking school administrators testifying as witnesses, demonstrated why this asserted defense was no defense. In essence, it boiled down to this. No matter how much good faith was ascribed to the Board and the administrators, the fact remained that the Board categorically reaffirmed its adherence to the formal policy of a segregated system. That meant that until such time as the Board expressly rescinded that policy, no School Principal, Assistant Superintendent, or Superintendent could approve the requested transfer of a Negro student to an all-white school. To be sure, individual Board mambers testifying with evident sincerity which we, as did the District Court, can credit freely, asserted repeatedly that they would give careful and earnest, conscientious consideration to any such request. But except to state that they would not base it on race or color, no standards were suggested by which any such applications were to be tested.
 
 
 4
 The difficulty was that this merely indicated a willingness to modify on an ad hoc basis the universal policy of segregation which up to that time (and since) the Board had refused to abandon or rescind. In effect the Board was urging that a court order is not needed because the Board, when and as occasion demands, might alter its policy which it had shown no disposition to change even though the principal purpose of this very lawsuit was to achieve that end. Other uncontradicted facts also bore on this. Significant was the concern repeatedly voiced through these responsible officials that any voluntary attempt to assign pupils without regard to race imperiled the financial position of the school system, its educational prestige and standing, as well as the personal liberty of school officials by reason of the sanctions of the Texas anti-integration legislation.[3] The Court had every reason to conclude that were such dire consequences to attach to any individual determination of a specific transfer request, Board members would be under overpowering pressures which would, or might, obscure or obliterate intrinsic merits of the application. The Court recognized as well that these very pressures would make the process of determination different from that presented routinely for white students. Reposing as he did the utmost confidence in the conscientious good faith of these officials honestly to try to fulfill imperative legal demands, the Judge saw that continuation of the policy of segregation inescapably injected factors which were extraneous to the simple constitutional proposition that race could under no circumstances be a basis for student assignment, transfer or non-transfer. He concluded, as he was bound to do-- certainly ever since Jackson v. Rawdon, 5 Cir., 1956, 235 F.2d 93, 96, cert. denied 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160-- that an order was needed categorically abolishing that policy and requiring the School Board to present a tangible, acceptable, reasonable plan of desegregation for court approval.
 
 
 5
 But, says the Board, the Court erred in entering such an order because the plaintiffs failed to establish that this was a class suit as claimed by them in the complaint. Putting it another way, the Board urges that even conceding a decree was permissible granting desegregation relief as to some of the individual plaintiffs, it could not do this in the form of a decree extending such rights to all other persons similarly situated. The record factual background for this matter is very simple. Two adults, Teal and Flax, on behalf of their named children and 'in behalf of all other Negro minors who are similarly situated, bacause of their race and color within the Fort Worth Independent School District, * * *' brought the suit in 1959. Teal, the father of nine children of school age, on the trial reaffirmed his pre-trial discovery deposition testimony to the effect that he was bringing this suit for his own children, and not for other Negro children. Flax, a Sergeant at Carswell Air Force Base, father of one child, was not examined along these lines. His testimony was silent on whether he was, or was not, bringing it for others. The effect of the District Court's holding is that in the circumstances of this record, it was not essential that Sergeant Flax state that he was bringing the suit on behalf of all. We agree.
 
 
 6
 At the outset we are not at all certain that the right of these plaintiffs to bring the suit on behalf of all Negro children in Fort Worth was really disputed. The complaint alleged with great precision that the action was a class suit brought for all under F.R.Civ.P. 23(a) (3). To this paragraph the Board entered a denial, but this was tied immediately to the basic contention elaborated on at great length and stated in various ways in the answer that a class action was not appropriate since each student is admitted, assigned and transferred as an individual. Such matters are not, the defendants asserted, determined on a class basis since the Board 'must register each child one at a time as individuals.' The effect of this response was to challenge the right to bring a class action by reason of the intrinsic nature of the rights involved. It did not dispute that the plaintiffs Teas and Flax were claiming to act for all. In short, the Board requested the Court to do as it ultimately did-- determine propriety of a class suit on what the total record revealed, not upon the conclusory declarations (pleaded or oral) of the litigants.
 
 
 7
 On the intrinsic merits, the District Court was certainly correct. Properly construed the purpose of the suit was not to achieve specific assignment of specific children to any specific grade or school.[4] The peculiar rights of specific individuals were not in controversy. It was directed at the systemwide policy of racial segregation. It sought obliteration of that policy of system-wide racial discrimination. In various ways this was sought through suitable declaratory orders and injunctions against any rule, regulation, custom or practice having any such consequences. The case therefore had those elements which are sometimes suggested as a distinction between those which are, or are not, appropriate as a class suit brought to vindicate constitutionally guaranteed civil rights.[5] The pleaded reason for challenging the class suit was, therefore, unfounded.
 
 
 8
 Apart from formal pleadings which were substantively insufficient to raise a real contest, the record of the trial as the case actually developed more than satisfied every substantial requirement for a class suit. 2 Barron & Holtzoff 562.1 (Wright ed. 1961); Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156; Avery v. Wichita Falls Independent School Dist., 5 Cir., 1957, 241 F.2d 230. There was, first, a common question of law arising out of a common fact situation. The issue of law-- may the School Board constitutionally assign Negro children to schools solely by reason of race?-- was common to every Negro child in the Fort Worth District. Second, the number of persons interested was more than ample to make joinder both impracticable and unhelpful. The record reflects that Negro students numbered over 13,000. Third, there was not the slightest suggestion either on the trial (or since) that within that large mass there was any substantial conflict either in interest or in the legal positions to be advanced. Fourth, the interest of the group and all its constituents were adequately and ably asserted and represented. Fifth, and perhaps most important, the relief to the class as it was sought and obtained was a good deal more than something merely appropriate. There is at least considerable doubt that relief confined to individual specified Negro children either could be granted or, if granted, could be so limited in its operative iffect. By the very nature of the controversy, the attack is on the unconstitutional practice of racial discrimination. Once that is found to exist, the Court must order that it be discontinued. Such a decree, of course, might name the successful plaintiff as the party not to be discriminated against. But that decree may not-- either expressly or impliedly-- affirmatively authorize continued discrimination by reason of race against others. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. Moreover, to require a school system to admit the specific successful plaintiff Negro child while others, having no such protection, were required to attend schools in a racially segregated system, would be for the court to contribute actively to the class discrimination proscribed by Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, 499, on rehearing 308 F.2d 503; see also Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191. The effect of this last consideration is to afford additional basis for affirmance. In this light, if it was an error to treat the case as a class suit and enter such a decree, such error, if any, was harmless since the decree for all practical purposes would have been the same had it been confined to the Teal or Flax children.
 
 
 9
 As to the remaining contentions to the Board, we find none of any merit. A 3-judge court was certainly not required. Insofar as the Texas statutes asserted require a plebiscite to determine whether a community is going to follow the Constitution of the United States, or will subject school authorities to punishment for compliance with a valid federal court decree prohibiting segregation, the constitutional invalidity of such statute is so palpable as to make a contrary claim frivolous. Bailey v. Patterson, 1962,369 U.S. 31, 82 S.Ct. 549, 7 L.Ed. 2d 512; Boson v. Rippy, 5 Cir., 1960,285 F.2d 43, 45, n. 11. Insofar as these statutes are advanced as prescribing statutory machinery which must first be administratively exhausted, we repeat what we have so ofter held. Exhaustion of internal school system administrative remedies is not required so long as racial segregation is the authoritative accepted policy. Likewise, during such time, judicial effectuation of constitutional freedom from racial discrimination is not dependent upon, nor may it be restricted by, so-called pupil placement statutes such as Article 2900a, 2901a. Mannings v. Board of Public Instruction, 5 Cir., 1960, 277 F.2d 370; Gibson v. Board of Public Instruction, 5 Cir., 1954,272 F.2d 763; Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, 498-501; Board of Public Instruction of Duval county, Fla. v. Hon. Bryan Simpson, 1961, 366 U.S. 957, 81 S.Ct. 1944, 6 L.Ed.2d 1267. There is, thus, no occasion for us to explore at this time the scope and validity of those statutes.
 
 
 10
 The result is that the District Court's order must be affirmed. The cause is therefore remanded for receipt of the plan which must now be filed by the Board[6] in terms satisfactory to the District Court under controlling principles. Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, on rehearing 308 F.2d 503; Augustus v. The Board of Public Instruction of Escambia County, Florida, 5 Cir., 1962, 306 F.2d 862; Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191. The Court will also 'retain jurisdiction throughout the period of transition'[7] for such further and other action as may be required as it retains continuing supervision of the case.
 
 
 11
 Affirmed.
 
 
 12
 GRIFFIN B. BELL, Circuit Judge (concurring in part and dissenting in part).
 
 
 13
 I dissent with respect to when the thirty day period commences to run. See Footnote 6 of the opinion of the majority. The decree of the District Court provided that the defendants in that court should file a plan within thirty days 'after this judgment becomes final * * *.' Unlike my brothers, I have not the slightest doubt that this language means exactly what it says. Indeed, no party has indicated any doubt as to its meaning in this court. The period should not begin to 'run the moment our mandate is issued', but when our mandate is made the judgment of the District Court. This is the normal, orderly system followed by courts to return jurisdiction to the District Courts, and no reason whatever has been advanced for departure here. In plain fact, the modification of the judgment of the District Court, while possibly a matter of only a few days, is wrong in principle, purely gratuitous, and will come as a complete surprise to the parties.
 
 
 14
 I do not believe that Brown v. Board of Education, 1955, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 teaches that a Court of Appeals can best assess and solve the problems arising out of the implementation of the constitutional principles involved in the required transition from racially discriminatory to racially non-discriminatory school systems. Certainly, as the Supreme Court recognizes in that case and in Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, the District Courts having cases of this kind in charge can best perform the necessary judicial appraisal.
 
 
 15
 In my view, absent some compelling reason, we should never interfere in matters of this kind with an orderly solution being brought about by the District Courts and the responsible parties on the scene. This is doubly true where the modification has not been sought. This record demonstrates that the District Court is acting in good faith and proceeding with what it deems to be deliberate speed. The plaintiffs do not contend otherwise, and we should not for a moment inject this court into the local affairs of Fort Worth under the circumstances.
 
 
 16
 With regard to the contention of appellants that a class action was not made out, it is sufficient to say that the finding contained in the opinion of the District Court that the proof showed at least circumstantially that the prosecution of the case was for the benefit of all the Negro children who might be eligible to attend the Fort Worth public schools was not clearly erroneous. Otherwise, I concur in the result.
 
 
 
 [1]
 The detailed and able opinion of the District Court, Flax v. Potts, N.D.Tex., 1962, 204 F.Supp. 458, greatly simplifies our treatment of the case
 
 
 [2]
 Tex.Rev.Civ.Stat.Ann. Arts. 2900a, 2901a (Vernon Supp.1962)
 
 
 [3]
 Under Art. 2900a 4 a school district abandoning a racially dual system without a favorable local electoral vote loses accreditation and forfeits the right to receive State Foundation Program Funds. (Of a total of some 26 million in the Fort Worth budget, State Funds accounted for over 11 million.) In addition 'any person' violating such act is guilty of a misdemeanor incurring a fine from $100 to $1,000. Art. 2901a, enacted as a part of this legislation is the so-called pupil placement plan. Notable in it is Sec. 8 giving an objecting parent the absolute right to withdraw a child from a school if races are commingled. See also Art. 2906-1 authorizing school districts to close schools (but without loss of state aid, accreditation or teacher salaries) where military forces 'are employed or used upon the order of any Federal authority' on school grounds or vicinity
 
 
 [4]
 Contrary to the formal suggestion of mootness or want of parties filed with us by the Board, maintenance of a case making a frontal attack on a policy of system-wide segregation does not depend on the presence of one specific child making formal demand for admission to an all-white school as the one closest to the student's residence. Plans for desegregation often provide for this during the transitional stage. But the constitutional right asserted is not to attend a school closest to home, but to attend schools which, near or far, are free of governmentally imposed racial distinctions. Incidents are not required to 'make' a case. Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913; Baldwin v. Morgan, 5 Cir., 1958, 251 F.2d 780, 787. The fact that one or more of the Teal children or the Flax child may no longer live closer to a white school does not alter this suit
 
 
 [5]
 See 2 Barron & Holtzoff 562.1 (Wright ed. 1961); and compare Reddix v. Lucky, 5 Cir., 1958, 252 F.2d 930, and Sharp v. Lucky, 5 Cir., 1958, 252 F.2d 910
 Additionally, as we have recently pointed out, a school segregation suit presents more than a claim of invidious discrimination to individuals by reason of a universal policy of segregation. It involves a discrimination against a class as a class, and this is assuredly appropriate for class relief. Bugh v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, 499, modified on rehearing, 308 F.2d 503. See also Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191.
 
 
 [6]
 In the terminology used in the District Court's order the Board was required to file a plan 'within 30 days after this judgment becomes final.' Because appeal to this Court is a matter of statutory right, the parties and the District Court have acquiesced in the construction that the decree is not final until the instant appeal has been determined. As it would be unfair to leave the Board uncertain as to the time, we construe this provision of the District Court's decree to mean that the 30-day period commences to run the moment our mandate is received in the District Court. As grant of certiorari is a discretionary review and not one which the Supreme Court must hear as a matter of right, application for certiorari will not suspend it. Whether a stay will, or should, be issued pending certiorari will be determined by the Court, Judge, or Justice to whom any such application is made under 28 U.S.C.A. 2101(f)
 
 
 [7]
 Brown v. Board of Education, 1955, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083