**Theodore GIBSON, as next friend for Theodore Gibson, Jr., et al., Appellants,**

v.

**BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, FLORIDA, et al., Appellees.**

**No. 17814.**

United States Court of Appeals Fifth Circuit.

Nov. 24, 1959.

Robert L. Carter, New York City, G. E. Graves, Jr., Miami, Fla., for appellants.

Edward F. Boardman, Boardman, Bolles & Davant, Miami, Fla., for appellees.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

RIVES, Chief Judge.

This action, filed June 12, 1956, sought a judgment declaring Article 12, Section 12 of the Constitution of the State of Florida, F.S.A., and Section 228.09, Florida Statutes Annotated to be violative of the Fourteenth Amendment to the Constitution of the United States. That much has been conceded by the defendants from the beginning. The complaint further prayed that the Board of Public Instruction be ordered to desegregate the public schools of Dade County and be enjoined from requiring the plaintiffs and other Negroes of school age to attend or not to attend particular public schools because of their race. The district court dismissed the complaint because the plaintiffs had not made application for admission to a particular school. This Court reversed and, in effect, held that a primary and positive duty rested upon the Board of Public Instruction to comply with the May 17, 1954, ruling of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.[1] That holding was clearly required by the implementing decision, Brown v. Board of Education, 1955, 349 U.S. 294, 300, 301, 75 S.Ct. 753, 99 L. Ed. 1083, now reaffirmed in Cooper v. Aaron, 1958, 358 U.S. 1, 7, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19.

Upon remand, after a full hearing, the district court rendered final judgment declaring the Article of the State Constitution and the Section of the State Statutes under attack to be violative of the Fourteenth Amendment, as admittedly they are, but denying any further relief to the plaintiffs.[2] The present appeal is from that judgment.

To some extent the facts have been set forth in the former opinion of this Court (footnote 1, *supra*) and in the opinion of the district court (footnote 2, *supra*) upon remand. The bases for the rulings of the district court sufficiently appear

1. Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913.

2. The opinion of the district court is reported as Gibson v. Board of Public Instruction of Dade County, Florida, 170 F.Supp. 454.

in the following two extracts from its opinion:

"As to the prayer of the complaint that the Court order the defendants to promptly present a plan of desegregation of the schools, the Court finds that the Florida Pupil Assignment Law enacted by the Legislature of Florida since the filing of this suit meets the requirements of such a plan and the demands of the plaintiffs. * * *

* * * * * *

"The plaintiffs now have available to them adequate remedies under the Pupil Assignment Law for any of their grievances pleaded in the complaint. The record shows that they have not pursued them and until they do so and have been denied their rights they are not entitled to injunctive relief." Gibson v. Board of Public Instruction of Dade County, Fla., footnote 2, supra, 170 F. Supp. 454, 457, 459.

The Florida Pupil Assignment Law [3] was enacted on July 26, 1956, more than a month after the complaint in this case had been filed. Prior to the enactment of that law, it is conceded that the Public Schools in Dade County were racially segregated. Within a month after the enactment of the Pupil Assignment Law, the Board of Public Instruction of Dade County adopted an "Implementation Resolution." For the next school year 1956-57, then about to commence, that resolution assigned en masse the children to the same schools in which they were then enrolled, and assigned unregistered pupils "to the school in which he or she would have been registered had he or she been present." As to school terms after 1956-57, however, the resolution provided:

"Section 3. Prior to the close of the 1956-57 school year or such other date as the Board may specify and each year thereafter this Board, pursuant to the provisions of the Pupil Assignment Law, will assign to a school for the following year each child theretofore attending a school by assignment from this Board. The record of all assignments shall be open for inspection in the office of the superintendent, and, in addition thereto, notice of assignment shall be given to each pupil and his parents.

"Section 4. This Board will assign to a school for the 1956-57 school term and each year thereafter each qualified child, not heretofore attending a school by assignment from this Board, whose parent applied for admission of such child. Such assignment will be made pursuant to all of the provisions of the Pupil Assignment Law. Application for admission shall be made on forms to be approved by the board and made available at the office of the superintendent and the principal of each school. When completed, such applications shall be submitted by the superintendent for action by the board. Records of assignments hereunder shall be open for inspection in the office of the superintendent, and notice of assignment shall promptly be given the pupil and his parents should the application for admission to a specific school be denied."

A card form of application for admission was approved by the Board. That form contained no clear indication that the applicant should indicate any choice of schools, but contained in its upper left-hand corner the single word "School: .........." followed by a blank space. No notice or advice from the Board or Superintendent was given to the children and their parents, or to the school principals and teachers who received their applications for admission, to the effect that Negro children, or their parents for them, were now permitted to have considered fairly by the Board any choice to attend a school other than an all-Negro school. With very few possible excep-

3. Florida Statutes Annotated, Section 230.232.

766

tions, they all remained unaware that the pre-existing policy of the Board might have been changed. Under such circumstances, it is obvious that the pupil assignment cards manifested no conscious preference for continued segregation on a voluntary basis.

At the time of trial, in the Fall of 1958, complete actual segregation of the races, both as to teachers and as to pupils, still prevailed in the public schools of the County. A census record card kept by the Board on each pupil still showed the designation of his race by the initials "W. N. Y." The Superintendent explained: "Well, that form just hasn't been corrected. We have a multiplicity of forms, and all of them have been corrected except that one, that I know of." However, another Board form, captioned "Public Schools, Dade County, Florida, 1958–59 Substitute Teachers Guide," listed under the word "White," 12 Senior High Schools, 32 Junior High Schools, and 107 Elementary Schools, and under the word "Negro," 4 Senior High Schools, 5 Junior High Schools, and 19 Elementary Schools. The Superintendent explained that that list did not refer to pupils, but meant simply that, "The personnel, the instructional personnel are all one or the other." The distinction is not very meaningful so long as the schools having all Negro teachers also have all Negro pupils, and no other schools have any Negro teachers or pupils. From a careful study and consideration of the entire record, the conclusion is inescapable that the plaintiffs and the members of the represented class have not been afforded a reasonable and conscious opportunity to have their choice of school considered by the enrolling authorities. For all practical purposes, the requirement of racial segregation in the public schools continued at the time of trial.

That being true, we cannot agree with the district court that the Pupil Assignment Law, or even that the Pupil Assignment Law plus the Implementing Resolution, in and of themselves, met the requirements of a plan of desegregation of the schools or constituted a "reasonable start toward full compliance" with the Supreme Court's May 17, 1954, ruling. That law and resolution do no more than furnish the legal machinery under which compliance may be started and effectuated. Indeed, there is nothing in either the Pupil Assignment Law or the Implementing Resolution clearly inconsistent with a continuing policy of compulsory racial segregation.[4]

The district court cited in support of its decision Shuttlesworth v. Birmingham Board of Education, D.C.N.D.Ala. 1958, 162 F.Supp. 372. The judgment in that case was affirmed by the Supreme Court "upon the limited grounds on which the District Court rested its decision." Shuttlesworth v. Birmingham Board of Education, 1958, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145. The district court had limited its decision in that case so as not to pass separately upon any particular tests, parts or sections of the Alabama School Placement Act. See 162 F.Supp. at pages 382, 383. The decision was further limited to the constitutionality of the law *upon its face*. See 162 F.Supp. at page 384. The district court in the present case would extend the effect of the holding in the Shuttlesworth case, saying:

"The three-judge court in the Birmingham case also denied all injunctive relief to the plaintiffs and left them to the fair operation of the School Placement Law and the remedies therein provided. The Court in that case was likewise considering the issue raised by the complaint as a basis for the application for an injunction that despite the passage of the Pupil Placement Law, Negro students were still being assigned to the same schools on a basis of segregation of the races irrespective of the nearness of other

4. See Kelly v. Board of Education, D.C.M.D.Tenn.1958, 159 F.Supp. 272, 277.

public schools to the homes of the plaintiffs." [170 F.Supp. 458.] Gibson v. Board of Public Instruction of Dade County, Fla., supra, 170 F.Supp. 454, 458, 459. The plaintiffs in the Shuttlesworth case, supra, did in fact exhaust their administrative remedies under the Alabama School Placement Law. See 162 F.Supp. at pages 372, 373. The Shuttlesworth case in the district court was confined to an attack upon the constitutionality of the Placement Law on its face, and no evidence was offered to sustain the parts of the complaint charging discrimination by any means other than by the Placement Law upon its face. See 162 F.Supp. at pages 375, 376 and footnote 3. In our opinion, the Shuttlesworth case affords no support for the decision of the district court in the present case.

On the first appeal in this case, we said that so long as the requirement of racial segregation continues throughout the public school system it is premature to consider the effect of the law providing for the assignment of pupils to particular schools. See 246 F.2d at pages 914, 915. Obviously, unless some legally non-segregated schools are provided, there can be no constitutional assignment of a pupil to a particular school. We do not understand that the Fourth Circuit has ruled to the contrary.[5] The net effect of its rulings, as we understand them, is that the desegregation of the public schools may occur simultaneously with and be accomplished by the good faith application of the law providing for the assignment of pupils to particular schools. If that understanding is correct, then we readily agree.

In that connection, the Board may, if it chooses, submit for the consideration of the district court a plan whereby the plaintiffs and the members of the class represented by them are hereafter afforded a reasonable and conscious opportunity to apply for admission to any schools for which they are eligible without regard to their race or color, and to have that choice fairly considered by the enrolling authorities. In the event of the submission and approval of such a plan, the district court might properly wait a reasonable time for the necessary administrative action before finding whether further proceedings are necessary. In any event, the district court should proceed in accordance with this opinion and with the two opinions of the Supreme Court in Brown v. Board of Education, supra, and should retain jurisdiction during the period of transition.[6] The judgment is reversed and the cause remanded.

Reversed and remanded.

5. See Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724; Covington v. Edwards, 4 Cir., 1959, 264 F.2d 780; Holt v. Raleigh City Board of Education, 4 Cir., 1959, 265 F. 2d 95; Allen v. County School Board of Prince Edward County, Va., 4 Cir., 1959, 266 F.2d 507.

6. Brown v. Board of Education, 1955, 349 U.S. 294, at page 301, 75 S.Ct. 753, at page 756; see also, Rippy v. Borders, 5 Cir., 1957, 250 F.2d 690, 694.