Pecola Annette WRIGHT et al., Appellees,

v.

COUNCIL OF the CITY OF EMPORIA, and the members thereof, and School Board of the City of Emporia and the members thereof, Appellants.

UNITED STATES of America, and Pattie Black Cotton, Edward M. Francis, Public School Teachers of Halifax County, et al., Appellees,

v.

SCOTLAND NECK CITY BOARD OF EDUCATION, a body corporate, Appellant.

UNITED STATES of America, and Pattie Black Cotton, Edward M. Francis, Public School Teachers of Halifax County, and others, Appellees,

v.

Robert MORGAN, Attorney General of North Carolina, the State Board of Education of North Carolina, and Dr. A. Craig Phillips, North Carolina State Superintendent of Public Instruction, Appellants.

Alvin TURNER et al., and JoAnne Amelia Clayton et al., Appellees,

v.

Nos. 14552, 14929, 14930 and 14990.

United States Court of Appeals, Fourth Circuit.

March 23, 1971.

For majority opinions see 4 Cir., 442 F.2d 570, 575 and 584.

WINTER, Circuit Judge (dissenting and concurring specially):

I dissent from the majority's opinion and conclusion in No. 14,552, Wright v. Council of City of Emporia, 442 F.2d 570 (4 Cir. 1971), and in Nos. 14,929 and 14,930, United States v. Scotland Neck City Board of Education, 442 F.2d 575 (4 Cir. 1971). I concur in the judg-ment in No. 14,990, Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4 Cir. 1971), and I can accept much of what is said in the majority's opinion. There is, however, a broader basis of decision than that employed by the majority on which I would prefer to rest.

Because the majority makes the decision in *Emporia* the basis of decision in *Scotland Neck* and distinguishes them from *Littleton-Lake Gaston*, I will discuss the cases in that order. I would conclude that the cases are indistinguishable, as does my Brother Bryan, although I would also conclude that each was decided correctly by the district court and that in each we should enjoin the carving out of a new school district because it is simply another device to blunt and to escape the ultimate reach of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and subsequent cases.

– I –

While the legal problem presented by these cases is a novel one in this circuit, I think the applicable legal standard is found in the opinion of the Supreme Court in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In rejecting a "freedom of choice" plan under the circumstances presented there, the Court articulated the duties of both a school board and a district court in implementing the mandate of *Brown:*

> The burden on a school board today is to come forward with a plan that promises realistically to work, *and promises realistically to work now.*
>
> \* \* \* \* \* \*
>
> Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system *"at the earliest practicable date,"* then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indi-

cate a lack of good faith; *and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method.* (emphasis added.)

391 U.S. at 439, 88 S.Ct. at 1694.

In each of the instant cases, following a protracted period of litigation, a plan designed finally to institute a unitary school system was jeopardized by the attempt of a portion of the existing school district to break away and establish its own schools. I think the advocates of such a subdivision bear the "heavy burden" of persuasion referred to in *Green* because, as in that case, the dominant feature of these cases is the last-minute proposal of an alternative to an existing and workable integration plan. Factually, these cases are not significantly dissimilar from *Green*. Each act of secession would necessarily require the submission and approval of new integration plans for the newly-created districts, and thus each is tantamount to the proposal of a new plan. And while the act giving rise to the alternative approach here is state legislation rather than a proposal of the local school board, the fact remains that the moving force in the passage of each piece of legislation[1] was of local origin. Few who have had legislative experience would deny that local legislation is enacted as a result of local desire and pressure. It is, therefore, to local activities that one must look to determine legislative intent.

Application of the "heavy burden" standard of *Green* to the instant cases is also supported by considerations of policy. In an area in which historically there was a dual system of schools and at best grudging compliance with *Brown*, we cannot be too careful to search out and to quash devices, artifices and techniques furthered to avoid and to postpone full compliance with *Brown*. We must be assiduous in detecting racial bias masking under the guise of quality education or any other benevolent purpose. Especially must we be alert to ferret out the establishment of a white haven, or a relatively white haven, in an area in which the transition from racially identifiable schools to a unitary system has proceeded slowly and largely unwillingly, where its purpose is at least in part to be a white haven. Once a unitary system has been established and accepted, greater latitude in redefinition of school districts may then be permitted.

Given the application of the *Green* rationale, the remaining task in each of these cases is to discern whether the proposed subdivision will have negative effects on the integration process in each area, and, if so, whether its advocates have borne the "heavy burden" of persuasion imposed by *Green*.

– II –

*Emporia School District*

The City of Emporia, located within the borders of Greensville County, Virginia, became a city of the second class on July 31, 1967, pursuant to a statutory procedure dating back to the 19th Century. While it had the state-created right at that time to establish its own school district, it chose instead to remain within the Greensville County system until June, 1969. It is significant that earlier in this same month, more than a year after it had invalidated a "freedom of choice" plan for the Greensville County system, the district court ordered into effect a "pairing" plan for the county as a further step toward full compliance with *Brown* and its progeny.

The record amply supports the conclusion that the creation of a new school district for the City of Emporia would, in terms of implementing the principles of *Brown*, be "less effective" than the existing "pairing" plan for the county system. In the first place, the delay involved in establishing new plans for the

---

1. In *Emporia*, the implementing legislation for the separation already existed; however, the local people alone made the choice to exercise the option which the statute provided.

two new districts cannot be minimized in light of the Supreme Court's statement in *Green* that appropriate and effective steps must be taken at once. See also Carter v. West Feliciana School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L. Ed.2d 477 (1970); Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Secondly, as the district court found, the separation of Emporia from Greensville County would have a substantial impact on the racial balance both within the county and within the city. Within the entire county, there are 3,759 students in a racial ratio of 34.1% white and 65.9% black. Within the city there are 1,123 students, 48.3% of whom are white and 51.7% are black. If the city is permitted to establish its own school system, the racial ratio in the remainder of the county will change to 27.8% white and 72.2% black.[2] To me, the crucial element in this shift is not that the 48.-3%–51.7% white to black ratio in the town does not constitute the town a white island in an otherwise heavily black county and that a shift of 6% in the percentage of black students remaining in the county is not unacceptably large. Whenever a school area in which racial separation has been an historical fact is subdivided, one must compare the racial balance in the preexisting unit with that in the new unit sought to be created, and that remaining in the preexisting unit after the new unit's creation. A substantial shift in any comparable balances should be cause for deep concern. In this case the white racial percentage in the new unit will increase from 27.8% to 48.3%. To allow the creation of a substantially whiter haven in the midst of a small and heavily black area is a step backward in the integration process.

And finally, the subdivision of the Greensville County school district is "less effective" in terms of the principles of *Brown* because of the adverse psychological effects on the black students in the county which will be occasioned by the secession of a large portion of the more affluent white population from the county schools. If the establishment of an Emporia school district is not enjoined, the black students in the county will watch as nearly one-half the total number of white students in the county abandon the county schools for a substantially whiter system. It should not be forgotten that psychological factors, and their resultant effects on educational achievement, were a major consideration in the Supreme Court's opinion in *Brown*.

In my mind, the arguments advanced by the residents of Emporia in support of their secession from the county school system do not sustain the "heavy burden" imposed by *Green*. The essence of their position is that, by establishing their own schools over which they will exercise the controlling influence, they will be able to improve the quality of their children's education. They point to a town commitment to such a goal and, in particular, to a plan to increase educational revenues through increased local taxation. They also indicate that they presently have very little voice in the management of the county school system. Although, as the district court found, the existence of these motives is not to be doubted, I find them insufficient in considering the totality of the circumstances.

While the district court found that educational considerations were *a* motive for the decision to separate, it also found that "race was a factor in the city's decision to secede." Considering

2. As part of the establishment of the new system, the Emporia school board proposed a transfer plan whereby Emporia will accept county students upon payment of tuition. The record does not contain any projection of the number of county students who would avail themselves of the plan although in argument counsel was candid in stating that only white parents would be financially able to exercise the option. The transfer plan was quickly abandoned when it became apparent that it might not earn the approval of the district court.

the timing of the decision in relation to the ordering into effect of the "pairing" plan, as well as the initial proposal of a transfer plan, this finding is unassailable. *Green* indicates that the absence of good faith is an important consideration in determining whether to accept a less effective alternative to an existing plan of integration. The lack of good faith is obvious here.

When the educational values which the residents of Emporia hope to achieve are studied, it appears that the secession will have many deleterious consequences. As found by the district court, the high school in the city will be of less than optimum size. County pupils will be cut off from exposure to a more urban society. The remaining county system will be deprived of leadership ability formerly derived from the city. It will suffer from loss of the city's financial support, and it may lose teachers who reside in the city. To me, these consequences, coupled with the existence of the racial motive, more than offset the arguments advanced by the residents of Emporia. The separation, with its negative effects on the implementation of the principles of *Brown*, should be enjoined.

– III –

*Scotland Neck School District*

As the majority's opinion recites, the history of resistance to school desegregation in the Halifax County school system parallels the history of the attempts on the part of the residents of Scotland Neck to obtain a separate school district. The significant fact is that in spite of otherwise apparently cogent arguments to justify a separate system, the separate system goal was not realized until, as the result of pressure from the United States Department of Justice, the Halifax County Board agreed to transfer the seventh and eighth grade black students from the previously all-black Brawley School, outside the city limits of Scotland Neck, to the Scotland Neck School, previously all-white. Chapter 31 followed thereafter as soon as the North

Carolina legislature met. It is significant also that the Halifax County Board reneged on its agreement with the Department of Justice shortly before the enactment of Chapter 31.

The same negative effects on achieving integration which are present in the Emporia secession are present here. Although the City of Scotland Neck has already submitted a plan for its school district, delay will result in devising such a plan for the remaining portion of Halifax County. The racial balance figures show that the existing county system has 8,196 (77%) black students, 2,357 (22%) white students, and 102 (1%) Indian students. Within the city system, there would be 399 (57.4%) white and 296 (42.6%) black, while the remaining county system would be comprised of 7,900 (80%) black, 1,958 (19%) white and 102 (1%) Indian. The difference between the percentage of white students within the existing system and the newly-created one for Scotland Neck is thus 35%. A more flagrant example of the creation of a white haven, or a more nearly white haven, would be difficult to imagine. The psychological effects on the black students cannot be overestimated.

The arguments advanced on behalf of Scotland Neck are likewise insufficient to sustain the burden imposed by *Green*. Even if it is conceded that one purpose for the separation was the local desire to improve the educational quality of the Scotland Neck schools, the record supports the conclusion of the district court that race was a major factor. If the basic purpose of Chapter 31 could not be inferred from the correlation of events concerning integration litigation and the attempt to secede, other facts make it transparent. As part of its initial plan to establish a separate system, Scotland Neck proposed to accept transfer students from outside the corporate limits of the city on a tuition basis. Under this transfer system, the racial balance in the Scotland Neck area was 749 (74%) white to 262 (26%) black, and the racial balance in the rest of Halifax

County became 7,934 (82%) black, 1,608 (17%) white, and 102 (1%) Indian.[3] This proposal has not yet been finally abandoned. In oral argument before us, counsel would not tell us forthrightly that this would not be done, but rather, equivocally indicated that the proposal would be revived if we, or the district court, could be persuaded to approve it. I cannot so neatly compartmentalize Chapter 31 and the transfer plan as does the majority, and conclude that one has no relevance to the other. To me, what was proposed, and still may be attempted, by those who provided the motivation for the enactment of Chapter 31 is persuasive evidence of what Chapter 31 was intended to accomplish.

In terms of educational values, the separation of Scotland Neck has serious adverse effects. Because Scotland Neck, within its corporate boundaries, lacked sufficient facilities even to operate a system to accommodate the only 695 pupils to be educated, it purchased a junior high school from Halifax County. This school is located outside of the corporate boundaries of Scotland Neck. The sale deprives the students of Halifax County, outside of Scotland Neck, of a school facility. The record contains abundant, persuasive evidence that the best educational policy and the nearly unanimous opinion of professional educators runs contrary to the creation of a small, separate school district for Scotland Neck. A study by the State of North Carolina indicates that a minimally acceptable district has 3,500–4,000 pupils.

On the facts I cannot find the citizens of Scotland Neck motivated by the benign purpose of providing additional funds for their schools; patently they seek to blunt the mandate of *Brown.*

Even if additional financial support for schools was a substantial motive, the short answer is that a community should not be permitted to buy its way out of *Brown.* Here again, the "heavy burden" imposed by *Green* has not been sustained.

– IV –

*Littleton-Lake Gaston School District*

The majority's opinion correctly and adequately discloses the legislative response to court-ordered compliance with *Brown* and its progeny. That response was the creation of the Warrenton City School District and the Littleton-Lake Gaston School District. The overall effect of the creation of the Littleton-Lake Gaston district, the proposed tuition transfer plan, and the creation of the Warrenton City district (an act enjoined by the district court and not before us) would be to permit more than 4 out of 5 white students to escape the heavily black schools of Warren County. Even without the transfer plan, the racial balance in the Littleton-Lake Gaston district would show nearly 20% more white students than in the existing Warren County unit. To permit the subdivision would be to condone a devastating blow to the progress of school integration in this area.

Despite the assertion of the benign motives of remedying long-standing financial inequities and the preservation of local schools, I agree with the majority that the "primary" purpose and effect of the legislation creating the Littleton-Lake Gaston school district was to carve out a refuge for white students and to preserve to the fullest possible extent segregated schools. Aside from

3. There is apparent error in the computations made by the district court in this regard. The district court found that the net effect of the transfer plan would be to add 350 white students to the city system. Added to the resident white students (399), the total is 749, not 759 as indicated in the opinion of the district court. The district court's figure of 262 black students in the city under the transfer plan (a net loss of 34) appears correct. But when these two totals are subtracted from the figures given for the existing county system in 1968–1969 (2,357 white, 8,196 black and 102 Indian), the effects on the county are as shown above.

questions of motivation, the record shows that the new district was established to accommodate a total of only 659 students, despite state policy to the contrary and expert opinion that its small size rendered it educationally not feasible. And, as the majority indicates, there is no evidence that the residents of the Littleton area have been deprived of their proportionate voice in the operation of the schools of Warren County. In short, there is a complete absence of persuasive argument in favor of the creation of the new district.

While I agree that the injunction should stand, I disagree that injunctive relief should be granted only when racial motivation was the "primary" motive for the creation of the new district. Consistent with *Green,* we should adopt the test urged by the government in *Scotland Neck,* i. e., to view the results of the severance as if it were a part of a desegregation plan for the original system—that is, to determine whether the establishment of a new district would, in some way, have an adverse impact on the desegregation of the overall system. By this test the injunction would stand in the *Littleton-Lake Gaston* case, as well as in each of the two other cases, because in each of the three there is at least some racial motivation for the separation and some not insubstantial alteration of racial ratios, some inherent delay in achieving an immediate unitary system in all of the component parts, and an absence of compelling justification for what is sought to be accomplished.

SOBELOFF, Senior Circuit Judge, with whom WINTER, Circuit Judge, joins (dissenting and concurring specially).

In respect to Nos. 14,929 and 14,930, United States v. Scotland Neck City Board of Education, 442 F.2d 575 (4th Cir. 1971), and No. 14,990, Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. 1971), the two cases in which I participated, I dissent from the court's reversal in *Scotland Neck* and concur in its affirmance in *Littleton-Lake Gaston.* I would affirm the District Court in each of those cases. I join in Judge Winter's opinion, and since he has treated the facts analytically and in detail, I find it unnecessary to repeat them except as required in the course of discussion. Not having participated in No. 14,552, Wright v. Council of City of Emporia, 442 F.2d 570 (4th Cir. 1971), I do not vote on that appeal, although the views set forth below necessarily reflect on that decision as well, since the principles enunciated by the majority in that case are held to govern the legal issue common to all three of these school cases.

I

The history of the evasive tactics pursued by white communities to avoid the mandate of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), is well documented. These have ranged from outright nullification by means of massive resistance laws [1] and open and occasionally violent defiance,[2] through discretionary pupil

---

1. *See* Duckworth v. James, 267 F.2d 224 (4th Cir. 1959); Bush v. Orleans Parish School Bd., 188 F.Supp. 916 (E.D.La. 1960), aff'd per curiam, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); Bush v. Orleans Parish School Bd., 187 F.Supp. 42 (E.D.La.1960), aff'd per curiam, 365 U.S. 569, 81 S.Ct. 754, 5 L. E.2d 806 (1961); Aaron v. McKinley, 173 F.Supp. 944 (E.D.Ark.1959), aff'd sub nom., Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237 (1959); James v. Almond, 170 F.Supp. 331 (E.D. Va.1959), app. dis., 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987 (1959); Har-

rison v. Day, 200 Va. 439, 106 S.E.2d 636 (1959) (decided the same day as James v. Almond, *supra*).

2. *See* Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Armstrong v. Board of Education of City of Birmingham, Ala., 323 F.2d 333 (5th Cir. 1963), cert. denied sub nom., Gibson v. Harris, 376 U.S. 908, 84 S.Ct. 661, 11 L.Ed.2d 606 (1964); Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8th Cir. 1956); Holmes v. Danner, 191 F. Supp. 394 (M.D.Ga.1961), stay denied, 364 U.S. 939, 81 S.Ct. 686 (1961).

assignment laws [3] and public tuition grants in support of private segregated schools,[4] to token integration plans parading under the banner "freedom-of-choice." [5] One by one these devices have been condemned by the Supreme Court:

> [T]he constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously." Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed. 2d 5 (1958).

Neither these agencies, nor school boards, nor local communities have the right to put roadblocks in the way of effective integration. The Court has declared that "the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

Today, I fear, we behold the emergence of a further stratagem—the carving out of new school districts in order to achieve racial compositions more acceptable to the white community. The majority frankly acknowledges the "serious danger that the creation of new school districts may prove to be yet another method to obstruct the transition from racially separated school systems to school systems in which no child is denied the right to attend a school on the basis of race," *Emporia, supra* at 572. However, the court fashions a new and entirely inappropriate doctrine to avert that danger. It directs District Courts to weigh and assess the various purposes that may have moved the proponents of the new school district, with the objective of determining which purpose is dominant. District Courts are told to intercede *only* if they find that racial considerations were the *primary* purpose in the creation of the new school units.[6] I find no precedent for this test and it is neither broad enough nor rigorous enough to fulfill the Constitution's mandate. Moreover, it cannot succeed in attaining even its intended reach, since resistant white enclaves will quickly learn how to structure a proper record—shrill with protestations of good intent, all consideration of racial factors muted beyond the range of the court's ears.[7]

---

3. *See* Northcross v. Board of Education of City of Memphis, 302 F.2d 818 (6th Cir. 1962) ; Mannings v. Board of Public Instruction, 277 F.2d 370 (5th Cir. 1960); Gibson v. Board of Public Instruction, Dade County, Fla., 272 F.2d 763 (5th Cir. 1959); Orleans Parish School Board v. Bush, 242 F.2d 156 (5th Cir. 1957); United States Commission on Civil Rights, Civil Rights USA—Public Schools, Southern States, 2–17 (1962).

4. *See* Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Hall v. St. Helena Parish School Board, 197 F.Supp. 649 (E.D.La.1961), aff'd, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962).

5. *See* Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

6. The majority's test as stated in *Emporia, supra*, is as follows:
"Is the primary purpose a benign one or is the claimed benign purpose merely a cover-up for racial discrimination?"

7. The impracticability of the majority's test is high-lighted by the dilemma in which the District Judges found themselves in *Scotland Neck*:
In ascertaining such a subjective factor as motivation and intent, it is of course impossible for this Court to accurately state what proportion each of the above reasons played in the minds of the proponents of the bill, the legislators or the voters of Scotland Neck * * *. United States v. Halifax County Board of Education, 314 F. Supp. 65, 72 (E.D.N.C.1970).

If challenged state action has a racially discriminatory effect, it violates the equal protection clause unless a compelling and overriding legitimate state interest is demonstrated. This test is more easily applied, more fully implements the prohibition of the Fourteenth Amendment and has already gained firm root in the law. The Supreme Court has explicitly applied this test to state criminal statutes which on their face establish racial classifications. In 1964, striking down a Florida criminal statute which forbade a man and woman of different races to "habitually live in and occupy in the nighttime the same room," the Court stated in an opinion written by Justice White:

> Normally, the widest discretion is allowed the legislative judgment * * * ; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious. [Citations] But we deal here with a classification based upon the race of the participants, which must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States. This strong policy renders racial classifications "constitutionally suspect," Bolling v. Sharpe, 347 U.S. 497, 499 [74 S.Ct. 693, 98 L.Ed. 884]; and subject to the "most rigid scrutiny," Korematsu v. United States, 323 U.S. 214, 216 [65 S.Ct. 193, 89 L.Ed. 194]; and "in most circumstances irrelevant" to any constitutionally acceptable legislative purpose, Hirabayashi v. United States, 320 U.S. 81, 100 [65 S.Ct. 1375, 87 L. Ed. 1774].

McLaughlin v. Florida, 379 U.S. 184, 191–192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). Thus, the Court held that the proper test to apply in that case was "whether there *clearly appears* in the relevant materials some *overriding* statutory purpose *requiring* the proscription of the specified conduct when engaged in by a white person and a Negro, but not otherwise." *Id.* at 192, 85 S.Ct. at 289 (emphasis added). To the further argument that the Florida statute should be upheld because ancillary to and serving the same purpose as an anti-miscegenation statute presumed valid for the purpose of the case, the Court replied:

> There is involved here an exercise of the state police power which trenches upon the constitutionally protected freedom from invidious official discrimination based on race. Such a law, even though enacted pursuant to a valid state interest, bears a heavy burden of justification, as we have said, and will be upheld only if it is *necessary*, and not merely rationally related, to the accomplishment of a permissible state policy. *Id.* at 196, 85 S.Ct. at 290 (emphasis added).

There were no dissents in the *McLaughlin* case. The two concurring opinions serve to underline and buttress the test applied by the majority. Justice Harlan, joining the Court's opinion, added:

> I agree with the Court * * * that necessity, not mere reasonable relationship, is the proper test, see *ante* [pp. 195–196, 85 S.Ct. 283], p. 290. NAACP v. Alabama [ex rel. Flowers], 377 U.S. 288, 307–308 [84 S.Ct. 1302, 12 L.Ed.2d 325]; Saia v. New York, 334 U.S. 558, 562 [68 S.Ct. 1148, 92 L.Ed. 1574]; Martin v. Struthers, 319 U.S. 141, 147 [63 S.Ct. 862, 87 L.Ed. 1313]; Thornhill v. Alabama, 310 U.S. 88, 96 [60 S.Ct. 736, 84 L.Ed. 1093]; Schneider v. State, 308 U.S. 147, 161, 162, 164 [60 S.Ct. 146, 84 L. Ed. 155]; see McGowan v. Maryland, 366 U.S. 420, 466–467 [81 S.Ct. 1101, 6 L.Ed.2d 393] (Frankfurter, J., concurring).

> The fact that these cases arose under the principles of the First Amendment does not make them inapplicable here. Principles of free speech are carried to the States only through the

Fourteenth Amendment. The necessity test which developed to protect free speech against state infringement should be equally applicable in a case involving state racial discrimination —prohibition of which lies at the very heart of the Fourteenth Amendment. *Id.* at 197, 85 S.Ct. at 291. Justice Stewart, speaking for himself and Justice Douglas, expressed the view that the majority's test did not go far enough as applied to a *criminal* statute because no overriding state purpose *could* exist.

> * * * I cannot conceive of a valid legislative purpose under our Constitution for a state law which makes the color of a person's skin the test of whether his conduct is a criminal offense. * * * I think it is simply not possible for a state law to be valid under our Constitution which makes the criminality of an act depend upon the race of the actor.

*Id.* at 198, 85 S.Ct. at 292.

Three years later the Court dealt with a Virginia statute prohibiting interracial marriages. The statute was determined to be unconstitutional under the *McLaughlin* test, expressed here in these terms:

> At the very least, the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the "most rigid scrutiny," Korematsu v. United States, 323 U.S. 214, 216 [65 S.Ct. 193, 89 L.Ed. 194] (1944), and, if they are *ever* to be upheld, they must be shown to be *necessary* to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate. * * *
>
> There is patently no legitimate *overriding* purpose independent of invidious racial discrimination which justifies this classification.

Loving v. Virginia, 388 U.S. 1, 11, 87 S. Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (emphasis added). Justice Stewart filed a separate concurring opinion—reiterating his belief that there could never be a sufficiently compelling state purpose to justify a criminal statute based on racial classification. *Id.* at 13, 87 S.Ct. 1817.

Although *McLaughlin* and *Loving* dealt with criminal statutes and express racial classifications, numerous lower court decisions apply the strict "compelling" or "overriding" purpose standard in the civil area as well as the criminal, and extend its application to facially neutral state action which, in reality, is racially discriminatory in its effect. The definitive case is Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968), in which Judge Tuttle meticulously and exhaustively examines the lower court cases, including those "which have struck down rules and regulations which on their face appear to be non-discriminatory but which *in practice and effect,* if not purposeful design, impose a heavy burden on Negroes and not on whites, and operate in a racially discriminatory manner." *Id.* at 538–539 (emphasis added). He concludes his analysis with this formulation of the constitutional standard:

> In both the areas of racial classification and discrimination and First Amendment freedoms, we have pointed out that stringent standards are to be applied to governmental restrictions in these areas, and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The State must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement, [citations]; and in the absence of such compelling justification the state restrictions are impermissible infringement of these fundamental and preferred rights. *Id.* at 541.

The most recent application of the "compelling and overriding state interest" test is to be found in the Fifth Circuit's decision in Hawkins v. Town of

Shaw, 437 F.2d 1286 (5th Cir. 1971). The plaintiffs, Negro residents of Shaw, Mississippi, alleged racial discrimination by town officials in the provision of various municipal services. The District Court dismissed the complaint, applying a test akin to that used by the *majority* in this case: "If actions of public officials are shown to have rested upon rational considerations, irrespective of race or poverty, they are not within the condemnation of the Fourteenth Amendment, and may not be properly condemned upon judicial review." Hawkins v. Town of Shaw, 303 F.Supp. 1162, 1168 (N.D.Miss.1969). The Fifth Circuit reversed, pointing to the standard set forth in Jackson v. Godwin, *supra*, and stating, "In applying this test, defendants' actions may be justified only if they show a compelling state interest," Hawkins v. Town of Shaw, 437 F. 2d 1286 at 1288 (5th Cir. 1971).

In *Hawkins* the Fifth Circuit specifically considered the relevance of the defendant's "intent," or "purpose" as the majority in our case would label it. Conceding that "the record contains no direct evidence aimed at establishing bad faith, ill will or an evil motive on the part of the Town of Shaw and its public officials," *Id.* at 1291, the court held: "Having determined that no compelling state interests can possibly justify the discriminatory *results* of Shaw's administration of municipal services, we conclude that a violation of equal protection has occurred." *Id.* at 1292 (emphasis in original text).

Just as Shaw's administration of municipal services violates the constitutional guarantee of equal protection, so too

does the creation of the new Scotland Neck School District.[8] The challenged legislation carves an enclave, 57% white and 43% black, from a previously 22% white and 77% black school system.[9] No compelling or overriding state interest justifies the new district, and its formation has a racially discriminatory effect by allowing the white residents of Scotland Neck to shift their children from a school district where they are part of a 22% minority to one where they constitute a 57% majority.

The prevailing opinion draws comfort from the fact that the new school district, because all children in the same grade will attend the same school, will be "integrated throughout." I dare say a 100% white school district would also be "integrated throughout." The relevant question is what *change* in degree of integration has been effected by the creation of the new district. Here the change is an increase in the percentage of white pupils from 22% to 57%. The Constitution will no more tolerate measures establishing a ratio of whites to blacks which the whites find *more* acceptable than it will measures totally segregating whites from blacks. The 35% shift here is no less discriminatory because it is a shift from 22% to 57% than if it were one from 65% to 100%.[10]

The majority opinion makes the puzzling concession that:

> If the effect of this act was the continuance of a dual school system in Halifax County or the establishment of a dual system in Scotland Neck it would not withstand challenge under the equal protection clause, but we

8. Since even the majority concedes that the Littleton-Lake Gaston School District must be enjoined as a racially discriminatory scheme in violation of the Fourteenth Amendment, I do not discuss the facts of that case.

9. One percent of the pupils in Halifax County are Indians.

10. Judge Winter properly emphasizes in his separate opinion that the effect of the new school districts must be measured by comparing "the racial balance in the preexisting unit with that in the new unit sought to be created, and that remaining in the preexisting unit after the new unit's creation." Focusing, as do I, on the 35% increase in the white student population of the new Scotland Neck School District, he quite correctly notes that "[a] more flagrant example of the creation of a white haven, or a more nearly white haven, would be difficult to imagine."

have concluded that it does not have that effect. 442 F.2d 583.

The situation here is that the Act sets up in Halifax County two school systems, one with a 57:43 white to black ratio and the other with a 19:80 white to black ratio, in place of one school system with a 22:77 white to black ratio. Thus, the Act constructs a dual school system in Halifax County by the simple expedient of labeling the two sets of schools as separate districts. The majority does not explain why the Act can *create* a dual school system in Halifax County if it could not *continue* a dual system there. Nor do they explain why the Act can *establish* a dual school system in Halifax County if it could not *establish* one in Scotland Neck. Obviously no explanation is possible and the legislation severing the Scotland Neck School District fails to meet the test of the equal protection clause.

## II

Even if I accepted the majority's formulation as the proper doctrine to control these cases, which I certainly do not, I think their test is misapplied in *Scotland Neck*. The court accepts at face value the defendants' assertions that local control and increased taxation were the dominant objectives to be fulfilled by the new district, with the ultimate goal of providing quality education to the students of Scotland Neck. The facts plainly are to the contrary and demonstrate that, in projecting the new district, race was the primary consideration. The District Court specifically found that a significant factor in the creation of the new school district was

a desire on the part of the leaders of Scotland Neck to preserve a ratio of black to white students in the schools of Scotland Neck that would be acceptable to white parents and thereby prevent the flight of white students to the increasingly popular all-white private schools in the area.

United States v. Halifax County Board of Education, 314 F.Supp. 65, 72 (E.D. N.C.1970). The defendants do not contest this finding.[11]

What starkly exposes the true purpose impelling the redistricting adventure and belies the professions of lofty objectives is the transfer plan initially adopted by the Scotland Neck City Board of Education.[12] Under that plan, parents residing within Halifax County but outside the newly fashioned district could place their children in the Scotland Neck schools by paying a fee ranging from $100 to $125. The use of transfer plans of this nature as devices to thwart the mandate of Brown v. Board of Education, *supra*, has not been uncommon,[13] and the majority here has no difficulty in recognizing that the Scotland Neck transfer plan was a contrivance to perpetuate segregation. Initial applications

---

11. The defendants assert instead that the prevention of white flight is a legitimate goal. However, the Supreme Court in Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968), has directly addressed itself to this argument, and rejected it out of hand:

We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. "But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown II*, 349 U.S. [294] at 300, 75 S.Ct. [753] at 756.

*See also* Brunson v. Board of Trustees of School District No. 1 of Clarendon County, 429 F.2d 820 (4th Cir. 1970); Anthony v. Marshall County Board of Education, 409 F.2d 1287 (5th Cir. 1969). The defendants' candid admission serves only to emphasize the dominant racial considerations behind the whole scheme.

12. Although the School Board later abandoned the transfer plan, its initial adoption nevertheless reflects the Board's intentions.

13. *See* Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).

for transfer under the plan were received from 350 white and only 10 black children in Halifax County. The net result would have been a racial mix of 74% white, 26% black in the Scotland Neck School District, contrasting with 82% black, 17% white, 1% Indian, in the rest of Halifax County. Thus the transfer plan would have operated directly contrary to the obligation to desegregate the schools of Halifax County and distinctly evidences the design of the Scotland Neck School Board to bring into existence a white haven.

Curiously enough, despite its condemnation of the transfer plan, the court declares the plan not relevant in assessing the intent of the North Carolina legislature in enacting Chapter 31, since there is no evidence in the record to show that the legislative body knew a transfer plan would be effected. This reasoning is fallacious for legislators are not so naive and, in any event, are chargeable with the same motivations as the local communities concerned. The relevant inquiry under the majority's test is into the purposes for which state action was taken and, as Judge Winter observes in his separate opinion, when dealing with statutes designed to affect local communities, one must look to the localities to determine the purposes prompting the legislation.[14]

The size of the new school district in Scotland Neck is also a crucial factor to be taken into account in judging the genuineness of the alleged goal of quality education. The Report of the Governor's Study Commission on the Public School System of North Carolina favors the *consolidation* of school districts to increase efficiency in the operations of the public schools, and suggests 9,000–10,000 as a desirable pupil population, with 3,500 to 4,000 as a minimum.

Scotland Neck's minuscule new school district for 695 pupils—one fifth of the suggested minimum—is an anomaly that runs directly counter to the recommendation of the Study Commission that schools be merged into larger administrative units. Moreover, if quality education were the true objective and Scotland Neck residents were deeply concerned with increasing revenue to improve their schools, one might have expected that in-depth consideration would have been given to the financial and educational implications of the new district. However, the District Court found that:

> [t]here were no studies made prior to the introduction of the bill with respect to the educational advantages of the new district, and there was no actual planning as to how the supplement would be spent although some people assumed it would be spent on teachers' supplements.

United States v. Halifax County Board of Education, 314 F.Supp. at 74.

Also highly relevant in assessing the dominant purpose is the timing of the legislation splintering the Halifax County school system. During the 1967–68 school year the Halifax County School District maintained racially identifiable schools, and only 46 of the 875 students attending the Scotland Neck school were black. The next school year, under prodding by the Department of Justice, the Halifax County Board of Education assigned to the Scotland Neck school the entire seventh and eighth grades from an adjacent all-black county school, and promised to desegregate completely by 1969–70. A survey by the North Carolina State Department of Education in December 1968 recommended an integration plan which provided that 690 black and 325 white students should attend the

---

14. Moreover, as the District Court noted, local newspapers. including the *Raleigh News and Observer*, suggested that racial considerations, and not a concern for better education, motivated the legislation. For example, on February 14, 1969, a month before Chapter 31 was enacted, the *Raleigh News and Observer* commented editorially that the bill provided for an "educational island" dominated by whites and on February 22, 1969, suggested that if the bill passed, it would encourage other school districts to resort to similar legislation.

Scotland Neck school. It was only then that the bill which later became Chapter 31 was introduced in the General Assembly of North Carolina in 1969. The fact that the Scotland Neck School District was not formed until the prospects for a unitary school system in Halifax County became imminent leads unmistakably to the conclusion that race was the dominant consideration and that the goal was to achieve a degree of racial apartheid more congenial to the white community.[15]

### III

The court's incongruous holdings in these two cases, reversing the District Court in *Scotland Neck,* while affirming in the twin case, *Littleton-Lake Gaston,* cannot be reconciled. The uncontested statistics presented in *Scotland Neck* speak even louder in terms of race than the comparable figures for *Littleton-Lake Gaston.* The white community in Scotland Neck has sliced out a predominantly white school system from an overwhelmingly black school district. By contrast, the white community in Littleton-Lake Gaston was more restrained, gerrymandering a 46% white, 54% black, school unit from a county school system that was 27% white, 67% black.[16] The majority attempts to escape the inevitable implications of these statistics by attributing to the North Carolina legislature, which severed the Scotland Neck School District on March 3, 1969, benevolent motivation and obliviousness to the racial objectives of the local white community. Yet the majority unhesitatingly finds a discriminatory purpose in the similar excision of the new Littleton-Lake Gaston School District by the same legislators only one month later, on April 11, 1969. The earlier statute no less than the later provided a refuge for white students and maximized preservation of segregated schools. The record and the District Court's opinion in *Scotland Neck,* no less

than the record and the opinion in *Littleton-Lake Gaston,* are replete with evidence of discriminatory motivations. On their facts the two cases are as alike as two peas in a pod.

Judge Bryan soundly recognizes the discordance in the two holdings of the majority. The resolution he proposes is to reverse in both cases. This would indeed cure the inconformity, but at the cost of compounding the error. The correction called for lies in the opposite direction—affirmance in both cases.

### IV

If, as the majority directs, federal courts in this circuit are to speculate about the interplay and the relative influence of divers motives in the molding of separate school districts out of an existing district, they will be trapped in a quagmire of litigation. The doctrine formulated by the court is ill-conceived, and surely will impede and frustrate prospects for successful desegregation. Whites in counties heavily populated by blacks will be encouraged to set up, under one guise or another, independent school districts in areas that are or can be made predominantly white.

It is simply no answer to a charge of racial discrimination to say that it is designed to achieve "quality education." Where the effect of a new school district is to create a sanctuary for white students, for which no compelling and overriding justification can be offered, the courts should perform their constitutional duty and enjoin the plan, notwithstanding professed benign objectives.

Racial peace and the good order and stability of our society may depend more than some realize on a convincing demonstration by our courts that true equality and nothing less is precisely what we mean by our proclaimed ideal of "the equal protection of the laws." The palpable evasions portrayed in this series

---

15. It is also noteworthy that while the Scotland Neck community claims that it had not been accorded a fair allocation of county school funds over a period of years, this apparently became intolerable only when the Department of Justice exerted pressure for immediate action to effectuate integration.

16. Six percent of the pupils in Warren County are Indian.

of cases should be firmly condemned and enjoined. Such examples of racial inequities do not go unheeded by the adversely affected group. They are noted and resented. The humiliations inflicted by such cynical maneuvers feed the fires of hostility and aggravate the problem of maintaining peaceful race relations in the land. In this connection it is timely to bear in mind the admonition of the elder Mr. Justice Harlan, dissenting in Plessy v. Ferguson, 163 U.S. 537, 560, 16 S.Ct. 1138, 41 L.Ed. 256 (1896):

> The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law.

I dissent from the reversal in Nos. 14,929 and 14,930, United States v. Scotland Neck City Board of Education, 442 F.2d 583 (4th Cir. 1971), and concur in the affirmance in No. 14,990, Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. 1971).